**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**

------------------------------------------------------------------ X

EXPRESS FASTENERS, LTD.,           :

         :

     **Plaintiff,**        :

         :

     *v.*         :     **Court No. 26-00853**

         :

UNITED STATES,         :

         :

     **Defendant.**        :

------------------------------------------------------------------ X

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS</u>

NEVILLE PETERSON LLP
*Counsel for Plaintiff*

| | |
|---|---|
| John M. Peterson | Michael K. Tomenga |
| Maria E. Celis | Neville Peterson, LLP |
| Richard O'Neill | 1310 L Street, N.W., Suite 300 |
| Patrick B. Klein | Washington, DC 20005-4870 |
| Sanzida Talukder | (202) 776-1148 |
| One Exchange Plaza | mtomenga@npwdc.com |
| 55 Broadway, Suite 2602 | |
| New York, NY 10006 | |
| (212) 635-2730 | |
| jpeterson@npwny.com | |

Dated: June 30, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR JUDGMENT ON THE PLEADINGS .....................................................1

STATEMENT OF FACTS ...............................................................................................8

STANDARD OF REVIEW ............................................................................................15

ARGUMENT.................................................................................................................16

I.      Presidential Proclamation 10947 Imposes a Substantive Rule Which Must be
Implemented through Notice and Comment Rulemaking in Accordance With 5
U.S.C. § 553....................................................................................................16

II.     The FAQ and the CSMS Do Not Satisfy Rulemaking under the APA ............23

III.    Plaintiff timely protested and has a Viable Cause of Action under the APA. ...................28

IV.    The CEE Was Required to Modify the CSMS and FAQs on Steel Section 232 Duties
Pursuant to 19 U.S.C. § 1625(c). .......................................................................32

V.     The Valuation Statute at 19 U.S.C. § 1401a(f) Precludes the Choice of Valuation at a
Higher of Two Amounts. ....................................................................................33

VI.    The Paperwork Reduction Act Provides a Complete Defense to CBP's Retention of
Express Fasteners' Payment of Section 232 Tariffs. ...........................................34

## TABLE OF AUTHORITIES

**Cases**

*American Frozen Food Institute v. United States*, 18 C.I.T. 565 (1994)................................ 30, 31

*Assn. of Data Processing Service Orgs. v. Bd., of Governors of the Federal Reserve
   System,* 745 F.2d 677 (D.C. Cir. 1984)................................................................... 23

*Autoalliance Int'l, Inc. v. U.S.,* 29 C.I.T. 1082 (2005) ................................................ 30

*B.F. Goodrich Co. v. United States*, 747 F. Supp. 1148 (Ct. Int'l Trade 1992) ........................... 31

*C.J. Tower & Sons of Buffalo, Inc. v. United States*, 68 Cust. Ct. 377 (1972) ........................... 16

*Central Soya Co. v. United States*, 15 C.I.T. 105  F. Supp. 133 (Ct. Int'l Trade 1991) .............. 31

*Children's Hospital of the King's Daughters v., Azar*, 896 F.3d 615 (4th Cir. 2018)....... 24, 25, 26

*Chrysler Corp. v. Brown*, 441 U. S. 281 (1979) ..................................................... 18, 19, 31

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U. S. 402 (1971) ................................... 18

*Cmty. Nutrition Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987)...................................... 19

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ............................................................ 23

*Forest Lab'ys., Inc. v. United States*, 476 F.3d 877 (Fed. Cir. 2007) .............................. 15

*Gray Tool Co. v. United States*, 6 C.I.T. 333 (1983) ............................................... 29

*Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018) ....................................................... 38

*In Center for Auto Safety v. NHTSA*, 93 F. Supp. 2d 1 (District Court D.C.  2000)............... 37, 38

*Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ... 20, 27

*Iowa League of Cities v. EPA,* 711 F.3d 844 (8th Cir. 2013) ........................................ 25

*Keirton USA, Inc. v. United States*, 600 F. Supp. 3d 1270 (Ct. Int'l Trade 2022)....................... 16

*Lane v. U.S. Dept. of Agriculture*, 130 F.3d 106 (8th Cir. 1997) ................................... 22

*Learning Resources Inc. v. Trump*, 607 U.S. ___ , 146 S. Ct. 628 (2026) ................................ 4

*Mann Constr. v. United States*, 27 F.4th 1138 (6th Cir. 2022).................................... 19, 20, 22, 23

*Marcello v. Bonds*, 349 U.S. 302 (1995) ............................................................ 23

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ................................................. 25

*N. H. Hosp. Assn. v. Azar,* 887 F.3d 62 (1st Cir. 2018)............................................. 26

*N.Z. Lamb Co. v. United States*, 40 F.3d 377 (Fed. Cir. 1994)...................................... 15

*Nereida Trading Co. v. United States*, 34 C.I.T. 241 (2010)........................................ 29

*Perez v. Mortgage Bankers Assn.*, 575 U.S. 92 (2015) ............................................. 18, 19

*Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87 (1995)............................................. 18, 19

*Synergy Sport Int'l v. United States*, 17 C.I.T. 18 (1993) ......................................... 34

*Tenn. Hosp. Ass'n. v. Azar*, 908 F.3d 1029 (6th Cir. 2018) ........................................ 19

*Thompson v. Clark,* 741 F. 2d 401 (D.C. Cir.. 1984) ............................................... 18

*Universal Steel Prods., Inc. v. United States*, 495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) ........ 15

*Volkswagen of America, Inc. v. United States*, 532 F. 3d 1365 (Fed. Cir. 2008). ........................ 28

**Statutes**

19 U.S.C. § 1401a .......................................................................... passim

19 U.S.C. § 1484............................................................................. 23

19 U.S.C. § 1514............................................................................. 28, 29, 30

19 U.S.C. § 1592(a) ......................................................................... 23

19 U.S.C. § 1625(c) ......................................................................... 14, 32, 33

28 U.S.C. § 1581............................................................................. 28, 29, 31

28 U.S.C. § 2638............................................................................. 29, 30

28 U.S.C. § 2639(a)(1)....................................................................... 6

44 U.S.C. § 3501 .................................................................................................... 34
44 U.S.C. § 3502(3) ............................................................................................... 35
44 U.S.C. § 3512 .................................................................................................... 34
44 U.S.C. § 3518(c)(1) ........................................................................................... 35
5 U.S.C. § 551 .................................................................................................... 7, 17
5 U.S.C. § 553 ................................................................................................. passim
5 U.S.C. § 706(2) ..................................................................................... 7, 16, 17, 34
50 U.S.C. § 1701 .................................................................................................... 11

**Other Authorities**

Adrian Hemler, *Deconstructing Blocking Statutes: Why Extraterritorial Legislation Cannot Violate the Sovereignty of Other States*, 21 J. OF PRIV. INT'L. L. 115-134 (Apr. 16, 2025), https://www.tandfonline.com/doi/pdf/10.1080/17441048.2025.2479276 ................. 5
Cargo Systems Messaging Service ("CSMS") Message CSMS 65236374, dated June 3, 2025 ............................................................................................................... passim
Executive Order 14257 of April 2, 2025 .................................................................. 10
Executive Order 14411 of June 10, 2026 .................................................................. 37
FAQ Section 232 Duties on Steel and Aluminum. ......................................... 10, 14, 32
*How Can I Obtain Information About Importer Sanctions?*, U.S. CUSTOMS AND BORDER PROTECTION https://www.help.cbp.gov/s/article/Article-1038?language=en_US, last visited June 22, 2026 ............................................................................................. 37
*NY N350227 of July 15, 2025* ............................................................................... 14
*NY N351539 of August 19, 2025* ........................................................................... 13
Presidential Proclamation 10896 .................................................................... 1, 2, 3, 8
Presidential Proclamation 10947 .................................................................... 3, 5, 6, 7
Recording Law Editorial Team, *China Data Privacy Laws: PIPL, CSL & DSL Compliance Guide*, RECORDING LAW (March 21, 2026), https://www.recordinglaw.com/world-laws/world-data-privacy-laws/china-data-privacy-laws/ ........................................................................................................... 5
Scott Lincicome, Clark Packard and Alfredo Carrillo Obregon, *Tariffs by Unpublished Memo: Lawsuit Exposes How Opaque Enforcement Compounds the US Tariff Complexity Problem,* Cato Institute, CATO AT LIBERTY BLOG (Feb. 5, 2026, 2:07 PM), available at https://www.cato.org/blog/tariffs-unpublished-memo-lawsuit-exposes-how-opaque-enforcement-compounds-us-tariff-complexity. .......................................... 6
Treasury Decision 94-5 ........................................................................................... 30

**Regulations**

19 C.F.R. § 158.12 ................................................................................................. 28
19 C.F.R. § 177.1 .............................................................................................. 13, 32
19 C.F.R. § 177.2(a) ............................................................................................... 13
5 C.F.R. § 1320.3 .............................................................................................. 35, 36

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**
------------------------------------------------------------------ X

EXPRESS FASTENERS, LTD.,      :
            :
   **Plaintiff,**      :
            :
   *v.*        :   **Court No. 26-00853**
            :
UNITED STATES,      :
            :
   **Defendant.**     :
------------------------------------------------------------------ X

### <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS</u>

In accordance with Rule 12(c) of the Rules of the U.S. Court of International Trade ("USCIT R."), Plaintiff, Express Fasteners, Ltd. ("Express"), respectfully submits this Motion for Judgment on the Pleadings, seeking the relief sought in the Complaint.  Under USCIT R. 12(c), "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The Complaint alleges that Defendant, United States, through its agency, U.S. Customs and Border Protection ("CBP" or "Customs"), unlawfully assessed Section 232 duties on Plaintiff's imported merchandise by contradicting the very Presidential Proclamations that provided for them.

What if a government imposed a tax, threatened taxpayers with penalties if they failed to pay it or tried to evade it, but never made rules telling taxpayers how the tax was to be calculated? That is the problem plaintiff Express Fasteners brings before the Court in this action.

Acting pursuant to taxing authority delegated by Congress pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, the President, on February 10, 2025, issued Presidential Proclamation 10896, *Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 9817 (published February 18, 2025) ("the February 10[th] Presidential Proclamation" or

"Proclamation 10896"), determining that imports of steel mill products and steel "derivative products" posed a threat to the "national security." Seeking to "adjust" such imports into the United States, Paragraph 3 of that Proclamation imposed an additional 25 percent *ad valorem* duty, in addition to any other duty, on a wide range of steel "derivative products" including the machine screws and fasteners which plaintiff imports from Taiwan.[1]

Paragraph 12 of Proclamation 10896 directed Customs to prioritize reviews of imports of steel and steel derivative articles and to impose penalties on any efforts to avoid the payment of such duties:

> (12) CBP shall prioritize reviews of the classification of imported steel articles and derivative steel articles and, in the event that it discovers misclassification resulting in non-payment of the ad valorem duties proclaimed herein, it shall assess monetary penalties in the maximum amount permitted by law and shall not consider any evidence of mitigating factors in its determination. In addition, CBP shall promptly notify the Secretary regarding evidence of any efforts to evade payment of the ad valorem duties proclaimed herein through processing or alteration of steel articles or derivative steel articles prior to importation. In such circumstances, the Secretary shall consider the processed or altered steel articles or derivative steel articles for inclusion as derivative steel articles pursuant to clause 5 of this proclamation.

To implement CBP's review of said classification of imported steel articles, paragraph 14 of the Proclamation authorized the Secretary of the Treasury to issue any regulations necessary for the implementation of the Proclamation's provisions:

> (14) The Secretary may issue regulations and guidance consistent with this proclamation, including to address operational necessity.

---

[1] Paragraph 3 of the Proclamation provides in relevant part:

In order to establish increases in the duty rate on imports of certain derivative articles, subchapter III of chapter 99 of the HTSUS is modified as provided in Annex I and Annex II to this proclamation. Except as otherwise provided in this proclamation, . . . all imports of derivative steel articles specified in Annex II to this proclamation shall be subject to an additional 25 percent ad valorem rate of duty, with respect to goods entered for consumption, or withdrawn from warehouse for consumption. . ." on identified dates.

The Secretary did not issue any such regulations.

On June 3, 2025, the President issued Presidential Proclamation 10947 of June 3, 2025, *Adjusting Imports of Aluminum and Steel Into the United States,* 90 Fed. Reg. 24199 (published June 8, 2025) ("the June 3rd Presidential Proclamation" or "Presidential Proclamation 10947"), modifying the Section 232 tariffs which had been imposed through Proclamation 10896 and other Proclamations. The President "determined that it is necessary and appropriate to increase the tariff rate for imports of steel articles and derivative steel articles, and aluminum articles and derivative aluminum articles, from 25 percent *ad valorem* to 50 percent *ad valorem* effective as of 12:01 a.m. eastern daylight time on June 4, 2025." With respect to "derivative" steel articles, such as plaintiff's machine screws and fasteners, Paragraph 6 of Proclamation 10947 states:

> (6)    Notwithstanding any prior proclamation or Executive Order, the non-aluminum, non-steel content of all aluminum and steel articles and derivative articles shall be subject to tariffs pursuant to Executive Order 14257 of April 2, 2025 (Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits), as amended, and any other applicable tariffs.  The additional ad valorem duties described in clause 1 and clause 7 of this proclamation shall apply only to **the steel content of articles in Chapter 73 of the HTSUS** and only to the aluminum content of articles in Chapter 76 of the HTSUS.  U.S. Customs and Border Protection (CBP) shall issue authoritative guidance mandating strict compliance with declaration requirements for steel and aluminum content in imported articles and outlining maximum penalties for noncompliance, including that importers who submit underreported declarations may be subject to severe consequences, including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law.

(Emphasis added).  This paragraph imposes the 50% Section 232 tariff on, inter alia, "the steel content of articles in Chapter 73 of the HTSUS."

Paragraph 10 of Proclamation 10947 provides:

> (10)   The Secretary may issue regulations and guidance consistent with this proclamation, including to address operational necessity.

3

However, the Secretary never issued any "regulations" consistent with the proclamation. In particular, while the June 3rd Proclamation requires assessment of a 50% duty on "the steel content of articles in Chapter 73 of the HTS," and one can intuit from the fact that the tax is *ad valorem* that this 50% impost must be on the *value* of the steel content, Customs never issued a rule specifying how the value of said steel content was to be calculated and declared to Customs in import documents for the purposes of collecting the 50% levy. It is clear that the 50% tariff is not to be issued on the entire value of the article, since non-steel portions of the articles were to be assessed with the "reciprocal tariffs" which the President had imposed under claimed authority of the International Emergency Economic Powers Act ("IEEPA").[2]

The only guidance provided by Customs on this issue was a Frequently Asked Question ("FAQ") entry on one of the agency's website pages, suggesting only that importers should bear in mind the valuation "principles" set out in Section 402 of the Tariff Act of 1930, as amended, 19 U.S.C. § .[3]

In the absence of any clear and binding guidance from Secretary of the Treasury or Customs concerning how to value the "steel content" of "derivative articles," plaintiff and other

---

[2] These tariffs were recently held unlawful and unconstitutional by the United States Supreme Court in *Learning Resources Inc. v. Trump*, 607 U.S. ___, 146 S. Ct. 628 (2026).

[3] Ironically, Section 402 is intended only to value merchandise for the purpose of the imposition of tariffs imposed under Chapter 4 of title 19 of the United States Code. Thus, 19 U.S.C. § 1401a begins by stating:

**(a) Generally**

(1) Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, **for the purposes of this chapter**, on the basis of the following:

Here, notably, duties imposed under Section 232 are not imposed under Chapter 4 of Title 19, but under Chapter 7 of that Title.

similarly situated importers were left to fend for themselves.  Where an importer had access to factory cost data and knew what the factory had paid for the steel used to make an article, the importer could use that data.  But many importers did not have, and could not get access to, such data.[4]  Some tried to estimate the value of steel content by calculating such content from bills of materials and valuing it according to publicly available price indices or quotations.  Numerous other methods were tried.

Moreover, neither the Secretary nor Customs issued any guidance concerning how importers should account for costs of fabrication, processing, labor or other costs incurred in producing the merchandise, nor allocation of any profits or markups earned by the seller.[5]

Ultimately, CBP assessed a duty on plaintiff's machine screws and fasteners in liquidation by assessing the 50% ad valorem tariff on the entire entered value of the machine screws and fasteners—providing the same treatment to these steel "derivative articles" as Presidential Proclamation 10947 did to steel "mill products"—even though, by the Proclamation's terms, the

---

[4] Moreover, several foreign governments have in recent years enacted data privacy and cybersecurity laws which may prohibit disclosure of certain business data. *See., e.g.,* Recording Law Editorial Team, *China Data Privacy Laws: PIPL, CSL & DSL Compliance Guide*, RECORDING LAW (March 21, 2026), https://www.recordinglaw.com/world-laws/world-data-privacy-laws/china-data-privacy-laws/. Other countries have enacted "blocking statutes" which, among other things, prevent their citizens from complying with data demands by foreign governments. *See* Adrian Hemler, *Deconstructing Blocking Statutes: Why Extraterritorial Legislation Cannot Violate the Sovereignty of Other States*, 21 J. OF PRIV. INT'L. L. 115-134 (Apr. 16, 2025), https://www.tandfonline.com/doi/pdf/10.1080/17441048.2025.2479276

[5] Reference to the valuation principles set out in Section 402 of the Tariff Act of 1930, 19 U.S.C. § 1401a, are relatively unavailing. The first three bases of valuation in the statute — transaction value of the imported merchandise, 19 U.S.C. § 1401a(b), transaction value of identical or similar merchandise, 19 U.S.C. § 1401a(c) and deductive value, 19 U.S.C. § 1401a(d)—all seek to determine a value for the entire imported article, not a part of an article or of a particular constituent material. "Computed value," in 19 U.S.C. § 1401a(e), does call for the separate calculation of the costs of material and fabrication, plus an addition for general overhead and profit. But "computed value" can only be used by producers of goods, and the "cost of materials" is based on the producer's own books and records — data which, as noted above, is unavailable to most importers.

President intended the two classes of articles be treated differently. It appears that this decision to impose the 50% duty on the full value of a steel derivative article is consistent with the treatment set out in an unpublished Memorandum dated December 3, 2025, and issued by Customs' Center of Excellence and Expertise ("CEE") for Base Metals. (Hereinafter, the "CEE Memo")[6]

Finally, Customs' determination that the Section 232 duties should be assessed on the full value of plaintiff's goods—a decision entitled to a statutory presumption of correctness, *see* 28 U.S.C. § 2639(a)(1)—implies that Plaintiff, in making entry of the goods at bar, may have placed itself in peril "that importers who submit underreported declarations may be subject to severe consequences, including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law," as set out in paragraph 6 of Presidential Proclamation 10947.

However, for the reasons set forth herein, plaintiff submits that the imposition of additional duties on its merchandise in liquidation—indeed the imposition of *any* Section 232 tariffs on plaintiff's merchandise—is unlawful. Presidential Proclamation 10947, an exercise of delegated Congressional taxing power, established a "substantive rule" of general applicability, imposing obligations on affected members of the public. The Proclamation left "gaps" to be filled by agency rulemaking—specifically a gap concerning how the value of "steel content" and "non-steel content" for covered articles were to be determined and reported. It required the promulgation of

---

[6] As the entry liquidations in this case predate the issuance date of the CEE Memo, it is not directly implicated by Plaintiff's protest in this action. To the extent the treatment of Plaintiff's entries is consistent with the treatment in the CEE memo, it reinforces Plaintiff's contention that said Memo is not a regulation of the kind which the Secretary of the Treasury was required to make to implement the tariffs on steel "derivative products." *See* Scott Lincicome, Clark Packard and Alfredo Carrillo Obregon, *Tariffs by Unpublished Memo: Lawsuit Exposes How Opaque Enforcement Compounds the US Tariff Complexity Problem,* Cato Institute, CATO AT LIBERTY BLOG (Feb. 5, 2026, 2:07 PM), available at https://www.cato.org/blog/tariffs-unpublished-memo-lawsuit-exposes-how-opaque-enforcement-compounds-us-tariff-complexity.

a "legislative-type rule" pursuant to the notice-and-comment provisions contained in the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*, to guide the public. Section 10 of Proclamation 10947 gave the Secretary the power to issue such rules, but the Secretary failed to do so.

Because Customs failed to follow the requirements of the APA in this case, the Court must hold unlawful and set aside the assessment of Section 232 tariffs on the entries at bar pursuant to the APA, which requires a reviewing court to hold unlawful and set aside "action, findings and conclusions found to be arbitrary, capricious an abuse of discretion, or not otherwise in accordance with law," 5 U.S.C. § 706(2)(A) and done "without observance of procedure required by law", 5 U.S.C. § 706(2)(D).

Express challenges Customs' decision to liquidate its entries, 8GX-80217045 and 8GX-80204878 on the entire value of its steel screws and fasteners in contradiction to the February 10th and June 3rd Presidential Proclamations by failing to follow the APA rulemaking procedures.

**STATEMENT OF FACTS**

A. Plaintiff: Express Fasteners, Ltd.

Plaintiff is an importer from Glendale, Illinois.  Plaintiff Express imported certain machine screws and fasteners into the United States under cover of Consumption entries 8GX-80217045 and 8GX-80204878.  Complaint ¶ 7; Answer ¶ 7

B. Presidential Proclamations and Supporting CSMS/FAQ

The February 10th Proclamation imposes "national security" tariffs on certain imported steel articles, pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. Complaint ¶ 8; Answer ¶ 8.

Section (5) of Presidential Proclamation 10896 provides:

For purposes of implementing the requirements in this proclamation, importers of steel derivative articles shall provide to U.S. Customs and Border Patrol within the Department of Homeland Security (CBP) any information necessary to identify the steel content used in the manufacture of steel derivative articles imports, covered by this Proclamation. CBP shall implement the information requirements as soon as practicable.

Annex I to Presidential Proclamation 10896 further provides:

For any derivative steel article below [which identifies derivative steel articles classified in chapter 73 of the Harmonized Tariff Schedule of the United States (HTSUS)] or any derivative steel article set forth in a subsequent Federal Register notice that is not in Chapter 73 of the HTSUS, the additional *ad valorem* duty shall apply only to the steel content of the derivative article

*See* Complaint ¶ 9-10; Answer ¶ 9-10.

Proclamation 10947 or the June 3rd Presidential Proclamation imposed "national security" tariffs on various imported steel articles and steel-containing "derivative articles."

Paragraph 6 of Presidential Proclamation 10947, provides:

6) Notwithstanding any prior proclamation or Executive Order, the non-aluminum, non-steel content of all aluminum and steel articles and derivative articles shall be

8

subject to tariffs pursuant to Executive Order 14257 of April 2, 2025 (Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits), as amended, and any other applicable tariffs. **The additional ad valorem duties described in clause 1 and clause 7 of this proclamation shall apply only to the steel content of articles in Chapter 73 of the HTSUS and only to the aluminum content of articles in Chapter 76 of the HTSUS**. U.S. Customs and Border Protection (CBP) shall issue authoritative guidance mandating strict compliance with declaration requirements for steel and aluminum content in imported articles and outlining maximum penalties for noncompliance, including that importers who submit underreported declarations may be subject to severe consequences, including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law.

(Emphasis Added). Neither Customs, nor any other government agency has issued regulations concerning the method or basis for calculating the "steel content of articles in Chapter 73 of the HTSUS," or the value thereof. Complaint ¶¶ 11-13; Answer ¶¶ 11-13.

However, Customs has issued a Cargo Systems Messaging Service ("CSMS") Message CSMS 65236374, dated June 3, 2025, and posted on Customs' website at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3e36d96 (last accessed on June 27, 2026) (hereinafter "the CSMS"). *See* Complaint Exhibit 3. The CSMS, which is the best evidence of its contents, is titled "*UPDATED GUIDANCE: Import Duties on Imports of Steel and Steel Derivative Products*" and provides in relevant part:

> As of June 4, 2025, for all steel and steel derivative articles classified in Chapter 73 that are subject to Section 232 steel duties under any Chapter 99 HTSUS heading, the applicable Section 232 duty is assessed only on the value of the steel content.

Complaint ¶¶ 14-16; Answer ¶¶ 14-16; Complaint Ex. 3. The CSMS provides reporting instructions for all steel and steel derivative articles in Chapter 73 and does not indicate that any steel items are excluded from this reporting instruction. *See id.*

The CSMS clearly indicates that if the steel content is less than the value of the entire steel article, the value of the item may be broken out into two tariff lines: one for steel content and one

9

for non-steel content. *See id.* Thus, according to the CSMS, the 50% 232 duty applies to only the steel content of the article. The non-steel content of the derivative article would be subject to duty at the "reciprocal" tariff rate made applicable to the country of origin under the relevant IEEPA Executive Order. *See* Executive Order 14257 of April 2, 2025, as amended by Executive Order 14326 of July 31, 2025, as further amended by Executive Order 14346 of September 5, 2025; and by various bilateral trade agreements into which the United States has entered.

In addition, Customs has posed on its website a "FAQ" feature regarding "Section 232 Duties on Steel and Aluminum." *See* https://www.cbp.gov/trade/programs-administration/entry-summary/232-tariffs-aluminum-and-steel-faqs (last updated July 31, 2025; last accessed June 27, 2026). *See* Complaint ¶ 17; Complaint Exhibit 4. Under the tab "How to determine the value of aluminum or steel content for derivative products outside of Ch. 76 or 73?" Customs has posted its only guidance concerning how to determine the value of steel content for derivative products subject to the Section 232 tariffs. The FAQ page states:

> The value of the steel/aluminum content should be determined in accordance with the principles of the Customs Valuation Agreement, as implemented in 19 U.S.C. 1401a. Thus, the value of the steel/aluminum content is the total price paid or payable for that content, which is the total payment (direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the country of importation) made/to be made for the steel/aluminum content by the buyer to, or for the benefit of, the seller of the steel/aluminum content. Normally, this would be based on the invoice paid by the buyer of the steel/aluminum content to, or for the benefit of the seller of the steel/aluminum content.

*See id.*

C. Plaintiff Made Entry Following the Published CSMS and FAQ

In making entry of the subject machine screws and fasteners, plaintiff followed Customs' published guidance and declared the value of the steel content for the machine screws and fasteners

10

as the cost to the manufacturer of purchasing the steel used to make the merchandise and paid the 50% Section 232 tariff on that value. Complaint ¶ 18; Answer ¶¶ 18-19.  For the non-steel value of the merchandise, such as the cost of machining and fabricating the steel into screws, factory overhead and the seller's profit, plaintiff deposited estimated Section 232 duties based on the "reciprocal tariff" rate in place at the time for the country of origin Taiwan, as established by the President under the Executive Orders issued under the claimed authority of IEEPA, 50 U.S.C. § 1701 *et seq*.  The value of the machine screw and fastener as a whole, for purposes of duties imposed under the Tariff Act of 1930, harbor maintenance taxes and merchandise processing fees, was determined on the basis of the imports' transaction value pursuant to 19 U.S.C. § 1401a(b).

    D.  Customs at the CEE Makes its Own Valuation Rules without Regard to its Authority

Customs, in liquidation, applied the 50% *ad valorem* Section 232 duty rate **to the entire entered value of the screws and fasteners**, not merely to the value of the steel purchased by the manufacturer to produce the merchandise. Complaint ¶ 20; Answer ¶ 20.

Customs based its action in liquidation on an unpublished memorandum which was issued to selected importers on or after December 3, 2025, by Customs Center of Excellence and Expertise ("CEE") for Base Metals (hereinafter the "CEE Memo"). Express Fasteners was made aware of this memorandum by another importer after it filed its protest. A copy of the CEE Memo is appended to Complaint Exhibit 1, *see* ECF 7.  The CEE Memo provides in essence that derivative products which, in their condition as imported consist solely of steel or solely of aluminum, are to be assessed with 50% tariffs on their full value, with no exclusions or exceptions for costs of fabrication or other value-added processes, overhead or profit.  The CEE Memo also states that all factory overheads and costs should be attributed solely to the steel or aluminum content of the imported article.  *See* Complaint ¶22.

11

With respect to "derivative articles," the CEE Memo States:

> If the articles are 100% steel or 100% aluminum, there is no non-steel/aluminum content to separate and Section 232 duty is assessed on the full entered value of the article. There is no backing out of any costs not allowed by the Customs Value laws. Manufacturing, labor, coating, etc. costs are not subtracted.

*See* ECF 7.

With respect to "derivative articles" which are not, in their condition as imported, composed 100% of steel or aluminum, the CEE Memo states:

> If the articles are not wholly of steel or aluminum (there are non-steel/aluminum parts/components), the Section 232 duty is assessed on the steel/aluminum content of the article.
>
> [Customs Headquarters] has said this would be based on "the invoice paid by the buyer of the steel/aluminum content to, or for the benefit of the seller of the steel/aluminum content." The current position is this represents what the importer paid for the steel/aluminum content of the finished article and is the entered value of the imported article minus the cost of the non-steel/aluminum part/component of the finished article. Non-steel/aluminum content does not refer to fabrication, machining, labor, costs, etc.
>
> If allowed to separate out steel/aluminum and non-steel/aluminum content value, separate out the cost to the importer of the non-steel/aluminum part/component. There is no backing out of any costs not allowed by the Customs Value laws. Costs for manufacturing, labor, coating, etc., are not subtracted.

*See* ECF 7.

Neither the CEE Memo, nor its contents sent to Express via the Customs Form ("CF") 29s, have been published by Customs as a regulation, or in any other official format. Customs admits such in its answer. *See* Answer at ¶ 25.  Customs' CEEs lack authority to issue legal interpretations of Presidential Proclamations.  The CEEs have been delegated only the authority granted to Port Directors according to CBP Decision 16-26, *Regulatory Implementation of the Centers for Excellence and Expertise, Interim Final Rule*. 81 Fed. Reg. 92978, 92979 (December 20, 2016) *citing* Delegation Order number 14-004, September 11, 2014.

12

According to CBP Regulations, the authority to issue interpretive rulings on Presidential Proclamations resides with the Office of International Trade, Regulations and Ruling Directorate in CBP Headquarters.[7]   With respect to the scope of interpretations that may be made by Regulations and Rulings, 19 C.F.R. § 177.1(d)(5) provides:

> The term "Customs and related laws," as generally used in this part, includes any provision of the Tariff Act of 1930, as amended (including the Harmonized Tariff Schedule of the United States), or the Customs Regulations, or any provision contained in other legislation (including the navigation laws), regulations, treaties, orders, proclamations, or other agreements administered by the Customs Service.

Rulings issued by Acting Director, National Commodity Specialist Division, Regulations and Rulings, and published on CBP's website in its Customs Rulings Online Search System ("CROSS") hold that section 232 duties apply only to the metal content of steel, aluminum or copper derivative articles subject to section 232 duties and 232 duties do not apply to the full value of the imported derivative articles declared by the importer.  Customs specifically determined that the 232 duties apply to the steel content of articles of Chapter 73.  *See NY N351539 of August 19, 2025* (Hardware packs for rail systems classified in Chapter 73.  For example:

> On March 12, 2025, Presidential Proclamation 10896 imposed additional tariffs on certain derivative iron or steel products. Additional duties for derivative iron or steel products of 50 percent are reflected in Chapter 99, headings 9903.81.89, 9903.81.90, and 9903.81.91. Products provided by heading 9903.81.91, as well as products of Chapter 73 provided by 9903.81.89 and 9903.81.90, will be subject to a duty of 50 percent upon the value of the steel content.

---

[7] Section 177.2(a) of the CBP Regulations, 19 C.F.R. § 177.2(a) provides:

A request for a ruling should be in the form of a letter. Requests for Valuation and Carrier rulings should be addressed to the Commissioner of Customs and Border Protection, Attention: Regulations and Rulings, Office of International Trade, Washington, DC 20229. The Division and Branch in the Regulations and Rulings, Office of International Trade, to which the request should be directed may also be indicated, if known. Requests for tariff classification rulings should be addressed to the Director, National Commodity Specialist Division, Regulations and Rulings, Office of International Trade, U.S. Customs and Border Protection, 201 Varick Street, Suite 501, New York, New York 10014

*See NY N350227 of July 15, 2025* (bolt and hex nut units classified in Chapter 73).

Neither the CEE Memo, nor its contents, have been published as an amendment to the CSMS Message nor the FAQ guidance, in accordance with the requirements of Section 625(c) of the Tariff Act of 1930, as amended 19 U.S.C. § 1625(c).

E.    Customs Issues CF29 to Express

On November 6, 2025, Express received a CF29 Notice of Proposed Action from Import Specialist ("IS") Sara Blackmore from the Base Metal CEE out of the Chicago, Illinois Field Office of CBP, providing a valuation advance proposal and asking for information of plaintiff's steel cost calculations.   Express on November 17, 2025, filed a response to the CF29, outlining its calculations per the CSMS.

On November 21, 2025, CBP Import Specialist Sara Blackmore indicated that she had decided to rate advance both entries and provided the following reasoning.

> Regarding content value, if you have an article that legitimately had non-steel/aluminum/copper content to separate, I believe the CBP position has shifted, but **no formal guidance has been posted**:
>
> Steel articles of chapter 72 are 100% steel. Section 232 duty is assessed on the full entered value of the article.
>
> For steel articles of chapter 73, aluminum articles of chapter 76, and articles classified elsewhere (not including chapter72):
>
> If the articles are 100% steel or 100% aluminum, there is no non-steel/aluminum content to separate and Section 232duty is assessed on the full entered value of the article.
>
> If the articles are not wholly of steel or aluminum (think in terms of parts/components), the Section 232 duty is assessed on the steel/aluminum content of the article.
>
> HQ has said this would be based on "the invoice paid by the buyer of the steel/aluminum content to, or for the benefit of the seller of the steel/aluminum content." The most recent position is **this is what the importer paid for the**

**steel/aluminum content of the finished article and is the entered value of the imported article minus the cost of the non-steel part of the finished article. "Non-steel content" does not refer to costs of fabrication, machining, labor, etc.**

If the value of the steel/aluminum content cannot be determined, then report the duty based on the total entered value, on only one entry summary line.

If allowed to separate out steel/aluminum and non-steel/aluminum content value, many importers have asked what costs they can exclude. There is no HQ guidance provided for "backing out" costs to arrive at the steel/aluminum content value for articles that that are not wholly of steel or aluminum (so no backing out fabrication, labor, machining, conversion, etc., costs).

As stated before, for articles that are wholly made of steel or aluminum, there is no backing out of any costs not allowed by the Customs Value laws (so no backing out fabrication, labor, machining, conversion, etc., costs).

*See* Complaint Exhibit 2 (Emphasis added). The reasoning explained by CBP in liquidation is virtually identical to that found in the now-public CEE Memo dated December 3, 2025.

Customs liquidated entry 8GX-80204878 on November 28, 2025, and 8GX-80217045 on December 12, 2025, assessing 50% on the entire value of the screws and fasteners. Express timely protests these liquidations and asked for accelerated disposition of the protest. The protest was deemed denied on January 11, 2026. Express filed this court case on January 27, 2026.[8]

## STANDARD OF REVIEW

"Judgment on the pleadings for a plaintiff is appropriate where there are no material facts in dispute and the plaintiff is entitled to judgment as a matter of law." *N.Z. Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994); *Forest Lab'ys., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007); *Universal Steel Prods., Inc. v. United States*, 495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021). In reviewing a motion for judgment on the pleadings, "the court accepts all well-

---

[8] CBP continues to rate advance entries of Express asserting that the 232 duties apply to the full value of the screws and fasteners for entries before April 2, 2026.

15

pleaded facts as true and views them in the light most favorable to the non-moving party." *Keirton USA, Inc. v. United States*, 600 F. Supp. 3d 1270, 1272 (Ct. Int'l Trade 2022); *see also C.J. Tower & Sons of Buffalo, Inc. v. United States*, 68 Cust. Ct. 377, 379 (1972) ("[W]hen a motion is directed solely to the pleadings, the movant admits the truth of his adversary's well-pleaded factual allegations but denies their sufficiency as a matter of law.").

The standard of review for any rulemaking that does not follow a hearing on the record is whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) and whether it was "without observance of procedure required by law", *Id.*, §706(2)(D).

Here, the undisputed facts are sufficient for the court to determine that the CEE Memo is invalid, as it violates the APA, and the actions of the CBP in liquidating plaintiff's entries at a higher value than the steel content of plaintiff's merchandise is an abuse of discretion as Customs violates APA rulemaking procedures. Similarly, all of the Section 232 tariffs imposed on "derivative articles" during the time Presidential Proclamation 10947 was in effect are invalid, given Customs' failure to issue legislative rules indicating how the tariffs were to be calculated.

## ARGUMENT

I. **Presidential Proclamation 10947 Imposes a Substantive Rule Which Must be Implemented through Notice and Comment Rulemaking in Accordance With 5 U.S.C. § 553.**

It is clear based on the CF29 actions that the ideas set forth in the "CEE Memo" were the basis for the final liquidation of entries, 8GX-80217045 and 8GX-80204878. Customs has (1) imposed new rules of general applicability for valuation of imported merchandise, specifically steel articles for purposes of the 232 duties; and (2) has imposed such new rules in violation of the "notice and comment" rulemaking procedures set out in the APA at 5 U.S.C. § 553. Specifically,

16

the government has not published the contents of the CEE memo as a proposed regulation, nor solicited public comment concerning it.  To the extent that the CEE Memo was required to be promulgated as a regulation pursuant to the APA, and has not been so promulgated, **it is null and void and of no effect**, and this court must set it aside pursuant to 5 U.S.C. § 706(2)(B), along with actions taken pursuant to the CEE Memo, such as the appraisement of plaintiff's imported goods in liquidation.

Under the APA, 5 U.S.C. § 551 et seq., a legislative rule—also called a substantive rule— is a regulation issued by an agency that creates new legal rights, duties, or obligations for the public.  These rules carry the full force and effect of law, similar to statutes passed by Congress, and must be adopted in accordance with the APA's procedural requirements to be valid and enforceable.  The key characteristic of a legislative rule is that it is binding on the public and the agency itself, it carries legal weight, and established they establish concrete standards.

The APA, at 5 U.S.C. § 551(4) defines a "rule" as follows:

(4)"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

Rulemaking "means agency process for formulating, amending, or repealing a rule," 5 U.S.C. § 551(5).

It is well-recognized that "substantive rules" must be promulgated using the "notice and comment" procedures set out at 5 U.S.C. § 553.  That statute prescribes a three-step procedure for so-called "notice-and-comment rulemaking."  First, the agency must issue a "[g]eneral notice of proposed rulemaking," ordinarily by publication in the Federal Register. *See* 5 U.S.C. § 553(b).

17

Second, if "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *See* 5 U.S.C. § 553(c). An agency must consider and respond to significant comments received during the period for public comment. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U. S. 402, 416 (1971); *Thompson v. Clark,* 741 F. 2d 401, 408, (D.C. Cir. 1984). Third, when the agency promulgates the final rule, it must include in the rule's text "a concise general statement of [its] basis and purpose." 5 U.S.C § 553(c). Rules issued through the notice-and-comment process are often referred to as "legislative rules" because they have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U. S. 281, 302-303 (1979) (internal quotation marks omitted).

Not all rules must be issued through the "notice and comment" process. Section 4(b)(A) of the APA provides that unless another statute states otherwise, the notice and comment requirement "does not apply" to "interpretive rules," general statements of policy, or rules of agency organization, procedure or practice, 5 U.S.C. § 553(b)(A). "Interpretive rules" are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers" *Shalala v. Guernsey Mem. Hosp*., 514 U.S. 87, 99 (1995) (internal quotation marks omitted). Interpretive rules often remind the public of an agency's interpretation of rules already in place. While it is easier for an agency to issue an interpretive rule than a substantive one, that convenience comes with a price, for interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process[.]" *Id.*; *Perez v. Mortgage Bankers Assn*., 575 U.S. 92, 97 (2015).

The APA distinguishes between "legislative rules" and "interpretive rules." Only the former are subject to the APA's notice-and-comment requirements. By statute, Congress has exempted interpretive rules from notice and comment. 5 U.S.C. § 553(b)(3)(A). Binding

18

"substantive agency regulations" by contrast must satisfy the required procedures. *Chrysler Corp. v. Brown*, 441 U.S. at 295 and 313-315 (1979). Some guideposts offer some clues in distinguishing the two types of rules.

Legislative rules have the "force and effect of law[;]" interpretive rules do not. *Perez*, 575 U.S. at 96-97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99). Legislative rules impose new rights or duties and change the legal status of regulated parties; interpretive rules articulate what an agency thinks a statute means or remind parties of pre-existing duties. *Tenn. Hosp. Ass'n. v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018). When rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules; interpretive rules merely clarify the requirements that Congress has already put in place. *See id.* at 1043; *see also Mann Constr. v. United States*, 27 F.4th 1138, 1143-45 (6th Cir. 2022) (hereinafter "*Mann Construction*") .

There can be no doubt that Presidential Proclamation 10947, a delegated exercise of Congressional power, requires implementation througha substantive rule requiring notice-and-comment rulemaking procedures. First, it imposes a tax. It proclaims a rule of general applicability; it affects all importers of steel "derivative products." It imposes an obligation on affected importers to report certain values and pay substantial duties on those values. The Proclamation exposes regulated parties to civil and criminal penalties for "underreporting" certain values, without specifying how those values should be determined and reported. It is well established that determination that a certain transaction is one taxpayers must report on pain of penalty—retains the essential qualities of a legislative rule subject to notice-and-comment procedures. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946-47 (D.C. Cir. 1987) (*per curiam*)

(characterizing an agency pronouncement as a legislative rule, rather than a policy statement, because language used in the document gave it present binding effect).

That a determination requires creation of a new HTSUS number for reporting is another strong indication that a legislative-type rulemaking is required. In *Invenergy Renewables v. United States*, 442 F. Supp. 3d 1255, 1283-1286 (Ct. Int'l Trade 2019), a Presidential determination to revoke a previously-granted Section 201 exemption for bifacial solar panels involved a required legislative rulemaking:

> . . . that the Exclusion and Withdrawal required an accompanying modification to the HTSUS is indicative of the determination that these actions are rulemakings. See *Int'l Custom Prods* [v. United States]., 549 F. Supp. 2d at 1395-96 ("Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied." (citations omitted)). The modification of the HTSUS underlines the prospective nature of these decisions and has the force of law. See 5 U.S.C. § 551(4) (defining a rule as having "future effect" and "prescrib[ing] the law"). Unlike specifically and retroactively applicable adjudications, here, the Exclusion and Withdrawal constitute broadly applicable, prospective changes to the tariff schedule that impact all future imports of solar products by any and all importers. See *Int'l Custom Prods*., 549 F. Supp. 2d at 1395-96. Finding that USTR's modification of the HTSUS was undertaken through notice-and-comment rulemaking, moreover, does not mean that all future modification of the HTSUS will require notice-and-comment rulemaking, as the Government contends. Def.'s Supp. Resp. to Invenergy's Mot. for PI at 2. As noted above, USTR must follow notice-and-comment rulemaking because the President gave USTR the discretion to design the Exclusion process, and USTR chose prospective, generally applicable, notice-and-comment rulemaking. See Pom Wonderful, 777 F.3d at 497.

Similarly, Presidential Proclamation 10947 required the promulgation of new HTSUS provisions, suggesting that implementation of the change necessitated a "substantive rulemaking" to effect it.

Instructive here is the decision in *Mann Construction Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022). In that case, the Internal Revenue Service ("IRS") issued Notice 2007-83, an informal document which described certain potential tax-avoidance transactions involving

insurance policies which, the Notice indicated, had to be reported to the IRS. When the plaintiffs did not report certain transactions specified in the notice, they were subjected to penalties. They argued that the Notice was a "substantive rule" required to be issued by the IRS using "notice and comment" rulemaking proceedings set out in 5 U.S.C. § 553. The court agreed:

Was this Notice a legislative rule? Yes. In explaining why, some background is in order. The APA distinguishes between "legislative rules" and "interpretive rules." Only the former are subject to the Act's notice-and-comment requirements. By statute, Congress has exempted interpretive rules from notice and comment. 5 U.S.C. § 553(b)(3)(A). Binding "substantive agency regulations" by contrast must satisfy the required procedures. *Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 313-315, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979). Some guideposts offer some clues in distinguishing the two types of rules.

Legislative rules have the "force and effect of law"; interpretive rules do not. Perez, 575 U.S. at 96-97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99, 115 S. Ct. 1232, 131 L. Ed. 2d 106 (1995)). Legislative rules impose new rights or duties and change the legal status of regulated parties; interpretive rules articulate what an agency thinks a statute means or remind parties of pre-existing duties. *Tenn. Hosp. Ass'n,* 908 F.3d at 1042. When rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules; interpretive rules merely clarify the requirements that Congress has already put in place. Id. at 1043.

Measured by these metes and bounds, Notice 2007-83 amounts to a legislative rule. The Notice has the force and effect of law. It defines a set of transactions that taxpayers must report, and that duty did not arise from a statute or a notice-and-comment rule. It springs from the IRS's own Notice. Taxpayers like Mann Construction had no obligation to provide information regarding listed transactions like this one to the IRS before the Notice. They have such a duty after the Notice. Obeying these new duties can "involve significant time and expense," and failure to comply comes with the risk of penalties and criminal sanctions, all characteristics of legislative rules. *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1591, 209 L. Ed. 2d 615 (2021); see also id. at 1592; Kristin E. Hickman, *Unpacking the Force of Law,* 66 Vand. L. Rev. 465, 524 (2013) (characterizing penalties as a leading indicator that a regulation is legislative rather than interpretive).

The Notice also stems from an express and binding delegation of rulemaking power. Congress tasked the IRS with determining "by regulations" how taxpayers must "make a return or statement" and the information they must provide to the IRS when doing so. 26 U.S.C. § 6011(a). Under the penalty provision for failing to report certain types of transactions, the statute delegates to the Secretary of the Treasury authority to "determine[]" which transactions have "a potential for tax

21

avoidance or evasion" or are "the same as, or substantially similar to, a transaction" deemed "a tax avoidance transaction." Id.§ 6707A(c)(1)-(2). The long and the short of it is that Congress "delegates to the Secretary of the Treasury, acting through the IRS, the task of identifying particular transactions with the requisite risk of tax abuse." CIC Servs., 141 S. Ct. at 1587. In identifying a new type of transaction purportedly satisfying these demands, Notice 2007-83 purports to carry out this congressional delegation. In every relevant way, the Notice has the stripes and colors of a legislative rule subject to the notice-and-comment process.

*See Mann Construction,* 27 F.4th at 1143-44.

The instant case is similar to *Mann Construction* in virtually all respects. Proclamation 10947, an exercise of delegated legislative taxing authority, established a new rule of general applicability which imposed new obligations on regulated members of the public—namely, an obligation to file Customs entries declaring the value of the "steel content" of imported "derivative products" and to pay a 50% duty thereon. The Proclamation empowered the Secretary of the Treasury to make any regulations necessary to effectuate its commands. The Proclamation left a gap for the agency to fill by regulation – specifically, defining how the value of the "steel content" should be calculated. However, the agency failed to issue this necessary definitional regulation. CBP's action in assessing the 50% tariff against plaintiff's goods—an act which, as noted above, could expose plaintiff to civil and criminal penalties—was taken without the issuance of any rule informing plaintiff and other regulated entities how this should be done.

There is nothing to suggest that Congress exempted CBP from the APA's requirement to conduct "notice and comment" rulemaking in this case. "The baseline assumption for agency action that will have the force and effect of law is that it must go through notice and comment. 5 U.S.C. § 553; *Mann Construction*, 27 F.4th at 1144. There is a presumption that APA rulemaking requirements apply to agency action. *Lane v. U.S. Dept. of Agriculture*, 130 F.3d 106, 109-110 (8th Cir. 1997). "Exemptions from the terms of the APA are not lightly to be presumed" *Marcello v.*

22

*Bonds*, 349 U.S. 302, 310 (1995); *Dickinson v. Zurko*, 527 U.S. 150, 155 (1999).  Nothing in Section 232 of the Trade Expansion Act or Proclamation 10947 suggests an intent to waive the rulemaking requirements of the APA in this case; indeed Section 10 of the Proclamation expressly contemplates rulemaking to make its pronouncements effective.  Whether faced with statutes potentially on one side of the line or the other (i.e., substantive v. interpretive), courts remain vigilant that "the import of the [5 U.S.C. § 559] instruction is that Congress intent to make a substantive change be clear." *Assn. of Data Processing Service Orgs. v. Bd., of Governors of the Federal Reserve System,* 745 F.2d 677, 686 (D.C. Cir. 1984).

Where, as here, Congress has tasked CBP with requiring importers to "make a return or statement" by filing Customs entries containing certain information, *see* 19 U.S.C. § 1484, and to do so under pain of penalty, *see* 19 U.S.C. § 1592(a), the intent that notice-and-comment rulemaking be done to indicate the information to be reported is especially clear. *Mann Construction,* 27 F.4th at 1144.

## II.    The FAQ and the CSMS Do Not Satisfy Rulemaking under the APA

Nor do the FAQ or CSMS message issued by Customs satisfy the requirement for a legislative rulemaking.  CSMS Message 65236374 of June 3, 2025, directs importers to make entry on a separate line item, using a particular HTSUS provision, but provides no guidance concerning how the value of the steel content should be calculated.  The FAQ does not specify a rule, but suggests that the value of the steel content be calculated "using the *principles of* the Customs Valuation Agreement, as implemented in 19 U.S.C. § 1401a[,]" paraphrasing that statute's definition of the transaction value of imported merchandise, *id.*, § 1401a(b), before suggesting that "[n]ormally, this would be based on the invoice paid by the buyer of the steel/aluminum content

to, or for the benefit of the seller of the steel/aluminum content" which, as noted above, would be information not available to many if not most importers.

An FAQ entry is not sufficient to create an enforceable rule, particularly not in the area of monetary regulation.  In *Children's Hospital of the King's Daughters v., Azar*, 896 F.3d 615 (4ᵗʰ Cir. 2018) (hereinafter "*Children's Hospital*"), a dispute arose concerning the maximum amount of financial assistance a hospital which served a disproportionate share of low-income or special needs patients (known as "disproportionate share hospitals" or "DSHs") could receive.  The Secretary of Health and Human Services (HHS) issued an FAQ on the agency's website, without following notice-and-comment rulemaking, taking the position that:

> . . . days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit. As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

The FAQ did not specify whether reimbursements received from private insurers should be taken into account in determining a DSH's maximum reimbursement.  Auditors took the position that private insurance reimbursements should be taken into account in calculating the reimbursements, with the result that the hospital was deemed to owe the agency $19.1 million.

The District Court took the position that the assessment against the hospital was not lawful, since the calculation formula was a "legislative rule" that was required to be promulgated via notice-and-comment rulemaking under the APA, and the Fourth Circuit affirmed:

> For the reasons that follow, we conclude that the district court correctly determined that the policy set forth in FAQ 33 constituted a "legislative rule" and, therefore, that the APA mandated that the agency establish the FAQ 33 policy through notice-and-comment rulemaking. See 5 U.S.C. § 553(a)-(c). We thus affirm the district court's judgment enjoining the Secretary from enforcing the policy set forth in FAQ 33 against Children's Hospital. Because we conclude that the policy violated the APA's procedural requirements, we decline to reach the substantive challenge by Children's Hospital to the FAQ 33 policy and vacate the part of the district court's

24

opinion addressing whether that policy conflicts with the language of 42 U.S.C. § 1396r-4(g).

Noting that "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or policy," citing *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014), the *Children's Hospital* court said that a rule is also legislative if it "expand[s] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created," *Children's Hospital* 896 F.3d at 620, quoting *Iowa League of Cities v. EPA,* 711 F.3d 844, 873 (8th Cir. 2013).

HHS conceded that the regulatory formula at issue in *Children's Hospital* did not specifically identify payments by Medicare or private insurers, leaving a "gap" for the agency to fill by rule.[9]  Rejecting HHS's argument that the FAQ policy had its genesis in a previously issued

---

[9] Thus, the Fourth Circuit ruled:

> We conclude that the policy set forth in FAQ 33 falls on the legislative end of the "spectrum," *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018), because (1) the policy of requiring DSHs to account for private insurance payments in calculating a DSH's uncompensated care costs does not derive from the statute or the 2008 rule and (2) the agency relied on—and continues to rely on—the Secretary's statutorily delegated authority to "determine[]" what constitutes "costs incurred" for purposes of calculating a DSH's payment adjustment as the legal basis supporting the policy. *See* 42 U.S.C. § 1396r-4(g)(1)(A).
>
> As to the first reason—that the policy in FAQ 33 does not derive from the statute or 2008 rule—the statute provides that a qualifying hospital's payment adjustment shall not exceed the hospital's "costs incurred" in providing services to Medicaid-eligible and uninsured patients. *Id.* The amount of "costs incurred" are to be "determined by the Secretary and net of payments [by Medicaid] and by uninsured patients." *Id*. Payments by private insurers are not, therefore, one of the two types of "payments" that the statute explicitly requires a DSH to "net" out in determining its "costs incurred." Likewise, the 2008 rule's formula for calculating "total annual uncompensated care" expressly requires hospitals to subtract only Medicaid payments and payments by uninsured individuals. 42 C.F.R. § 447.299(c)(16). Payments by private insurers, therefore, are not among the "payments" that the

regulation, the Court blatantly stated, "We disagree. The calculation methodology in the rule itself does not mention – let alone specifically address – payments by private insurers." *Id.*, at 621.

The second reason the *Children's Hospital* court held that notice and comment rulemaking was required to create an enforceable policy was that Congress had left a "gap" for the agency to fill through rulemaking:

> The second consideration supporting our conclusion that the policy in FAQ 33 amounts to a legislative rule—that the agency relies on the Secretary's statutorily delegated authority to "determine[]" what constitute "costs incurred" for purposes of calculating a DSH's uncompensated care costs as the legal basis supporting the policy—is closely connected to the statute's and 2008 rule's silence as to whether DSHs must net out private insurance payments in calculating their "costs incurred." As the First Circuit explained in concluding that FAQ 33 constituted a legislative rule, "[t]his textual silence on whether to offset [private insurance] payment[s] leads us to believe that any authority that the Secretary may have to adopt the rule at issue would most likely flow from Congress's delegation of a power to make a decision that Congress chose not to make itself." *N.H. Hosp.[Assn. v Azar]*, 887 F.3d at 71. The Secretary concedes as much, asserting that the policy set forth in FAQ 33 reflects a "reasonable exercise of the Secretary's expressly delegated authority to determine how to calculate 'costs incurred.'" Appellant's Br. 40.

Similarly, the FAQ which Customs issued with respect to the Section 232 duties at issue in this case falls far short of the legislative rule that was required to make the assessment of these tariffs on steel "derivative products" enforceable.  It does not fill the gap which the President, exercising delegated legislative power, declined to fill—namely, defining the value of the "steel content" of such products which was to be subject to a 50% ad valorem tariff. "When Congress leaves such a policy choice to the agency, "we should lean toward finding that the agency's making of that choice requires notice and comment." *N. H. Hosp. Assn. v. Azar,* 887 F.3d 62, 70 (1st Cir. 2018).

---

2008 rule expressly requires DSHs to account for in determining their "total annual uncompensated care."

The requirement of "notice and comment" rulemaking extends to Customs law matters.  In *Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019), the United States Trade Representative ("USTR") had previously excluded bifacial solar panels from the scope of goods subject to a Section 201 safeguard measure directed at solar panels.  The initial determination of goods subject to the measures had been done using notice-and-comment proceedings.  USTR sought to summarily withdraw bifacial solar panels from the list of goods excepted from the safeguards.   This Court held that USTR's withdrawal constituted agency rulemaking and was required to be done in accordance with APA-specified "notice and comment" procedures.  The Court held:

> The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment. *Perez*, 135 S. Ct. at 1206. The President delegated the authority to USTR to decide its procedures for the implementation of exclusions. Presidential Proclamation. USTR then published its procedures in the Federal Register, inviting "interested persons to submit comments identifying a particular product for exclusion from the safeguard measure and providing   reasons why the product should be excluded." Exclusion Procedures at 6671. USTR provided a deadline for the exclusion requests and a deadline for comments on those requests. Id. at 6,672. In other words, USTR outlined the process for its notice-and-comment rulemaking. USTR, moreover, opened a docket on the "Federal eRulemaking Portal," choosing a rulemaking docket over a non-rulemaking docket. Before the court is not whether USTR could have, in the first instance, adopted a procedure for adjudication of the exclusions, as Q Cells contends. See Q Cells' Resp. to Invenergy's Mot. for PI at 14 (quoting POM Wonderful, 777 F.3d at 497 ( "[T]he choice between rulemaking and adjudication lies in the first instance within the agency's discretion.")). Regardless of whether USTR could have set forth procedures for adjudication in the first instance, it did not. Instead, it made clear in the Exclusion Procedures its adoption of notice-and-comment rulemaking.

*Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d at 1285.

"Additionally," the *Invenergy* court held, "that the Exclusion and Withdrawal required an accompanying modification to the HTSUS is indicative of the determination that these actions are rulemakings[.]" *Id.* at 1285.

27

In the instant case, Proclamation 10947, also created new HTSUS headings, and required importers to report values thereunder.  It left a "gap" for the agency to fill, specifically, to define the values of "steel content" and "non-steel content" required to be reported to CBP – under pain of penalty.  Paragraph 10 of the Proclamation expressly empowered CBP to make any regulations necessary to effectuate the Proclamation's commands.[10]  CBP failed to act, leaving Plaintiff Express Fasteners and thousands of similarly situated importers to fend for themselves in attempting compliance.

### III.    Plaintiff Timely Protested and Has a Viable Cause of Action Under the APA.

There is no basis for the notion, expressed in Defendant's Answer in this case, that Administrative Procedure Act claims cannot be raised in a case founded on this CIT's 28 U.S.C. § 1581(a) "protest denial" decision.  In its Answer, ¶¶ 38, 40, 48, and 54, Defendant argues that plaintiff is precluded from filing an APA claim under 19 U.S.C. § 1514, citing *Volkswagen of America, Inc. v. United States*, 532 F. 3d 1365, 1367 (Fed. Cir. 2008).

However, the Government mischaracterizes that case, which actually supports plaintiff's position.  In *Volkswagen*, the plaintiff bypassed the period for protesting entry liquidations, filing claims for defective goods duty valuation allowances under 19 C.F.R. § 158.12. When Customs declined to grant the allowances, Volkswagen brought an APA-styled claim in an action filed under this Court's residual jurisdiction, 28 U.S.C. § 1581(i).  While the appellate court agreed that Volkswagen's case theory sounded in the APA, it held that these claims needed to be brought in a

---

[10] Even without a specific authorization in the Proclamation, Plaintiff contends that the agency had an independent obligation to determine whether legislative rulemaking was necessary to effectuate the Proclamation's commands immediately if needed. The APA gives an agency the option, for "good cause", to issue an "interim final rule" which is effective upon publication in the Federal Register with comments received an evaluated thereafter. *See* 5 U.S.C. § 553(b)(B). Customs chose not to follow this course either.

28 U.S.C. § 1581(a) case contesting the denial of a protest, noting that all value issues merge in the liquidation, and that 19 C.F.R.. § 158.12 did not create a new or separate cause of action. Commenting on the *Volkswagen* decision, this court, in *Nereida Trading Inc. v. United States*, 34 CIT 241, 251, 683 F. Supp. 2d 1348 (2010) stated that:

> 19 C.F.R. § 158.12 does not create a separate cause of action for [the allowance sought by the plaintiff], and that the only cause of action for such an allowance must be made pursuant to the procedures set forth in 19 U.S.C. § 1514.")

These decisions stand for the proposition that a cause of action found in the APA may, and often must, be raised in a case brought under 28 U.S.C. §1581(a).

It is also well-settled that when a plaintiff has filed a protest challenging one of the categories of protestable decisions listed in 19 U.S.C. §1514(a), and that protest is denied, the plaintiff, in a 28 U.S.C. §1581(a) case such as this one, may raise *any* argument in support of its claim. *See*, *Gray Tool Co. v. United States*, 6 C.I.T. 333 (1983).  Defendant also ignores 28 U.S.C. § 2638, which controls here:

**§ 2638 New grounds in support of a civil action**

In any civil action under section 515 of the Tariff Act of 1930 in which the denial, in whole or in part, of a protest is a precondition to the commencement of a civil action in the Court of International Trade, the court, by rule, may consider any new ground in support of the civil action if such new ground—

> (1) applies to the same merchandise that was the subject of the protest; and

> (2) is related to the same administrative decision listed in section 514 of the Tariff Act of 1930 that was contested in the protest.

Even if plaintiff's APA claims were considered a "new ground" in support of its valuation protest, the Court may consider the ground in support of the protest. Plaintiff's APA claims apply to the

merchandise which was the subject of the protest and is related to the same administrative decision listed in 19 U.S.C. § 1514(a)(1) ("the appraised value of the merchandise") presented in the protest.

Here, plaintiff has a properly filed 19 U.S.C. § 1514 protest claim, namely against the liquidation of entries challenging the appraised value of the merchandise, and asserting that Customs in appraising the goods and assessing Section 232 duties thereon, followed its own made-up rules (which plaintiff refers to as the "CEE Memo" as denied by defendant) in violation of the APA and notice and comment rule-making.

Here the APA is not an independent cause of action but is brought in a protest to the assessment of duties in liquidation.  Furthermore, this court acknowledged that, "[i]n hearing a § 1581(a) case, the court may also consider the procedures Customs followed in administering its protest decision."  This court further specified that APA claims are viable under 28 U.S.C. § 2638, which "permits this [c]ourt to consider any new grounds, such as the APA claim, during the course of [§ 1581(a)] litigation." *Autoalliance Int'l, Inc. v. U.S.,* 29 C.I.T. 1082, 1093-94 (2005).  The Government is incorrect and plaintiff is not precluded from raising APA issues in a 19 U.S.C. § 1514 protest case before this Court.

In *American Frozen Food Institute v. United States*, 18 C.I.T. 565 (1994), this Court invalidated a Customs pronouncement styled as "Treasury Decision 94-5," requiring special country of origin marking for imported frozen vegetables in packages.  The Court ruled that the requirement, failure to comply with could expose the importer to special marking duties and penalties, was a "legislative rule" that required notice and comment APA rulemaking before it could be adopted:

> The court concludes that because Customs has chosen to promulgate front panel marking in combination with other requirements clearly needing APA rulemaking procedures, the entirety of T.D. 94-5 may not stand. It would be neither reasonable for the court to bifurcate T.D. 94-5 when Customs did not do so originally, nor

30

equitable to proceed on two separate tracks for those parties who must comply and manufacture new labelling.

18 C.I.T at 575.

The claims raised in *American Frozen Food Institute, supra*, could have been raised by protesting an assessment of marking duties and challenging the denial of the protest, but this Court elected to hear the case under its 28 U.S.C. § 1581(h) pre-enforcement ruling review jurisdiction, to avoid "irreparable injury" plaintiff would suffer if forced to purse the protest remedy. But the *AFFI* court noted the decision in *B.F. Goodrich Co. v. United States*, 747 F. Supp. 1148, 1154 (Ct. Int'l Trade 1992), a 19 U.S.C. § 1581(a) case where the court invoked the APA to enjoin enforcement of a Customs drawback regulation containing conditions not found in the drawback statute.[11]

In conclusion, this is not a close case. Presidential Proclamation 10947, an exercise of delegated Congressional taxing power, imposed new substantive requirements of general applicability that imposed significant obligations on members of the public, to be performed under pain of civil and criminal penalties. It left "gaps" concerning important aspects of its command—specifically, how the "steel value" and "non-steel value" of steel "derivative products" should be calculated and declared to CBP, and how affected parties' duty-paying obligations should be calculated. It required the creation of new HTSUS items. Filling the gap required the promulgation of a "legislative rule" having "the force and effect of law", *see Chrysler Corp. v. Brown*, 441 U.S. at 302-303 (1979), and specifically authorized CBP to engage in rulemaking.

---

[11] *See* also *Central Soya Co. v. United States*, 15 C.I.T. 105, 761 F. Supp. 133 (Ct. Int'l Trade 1991) (in a 28 U.S.C. § 1581(a) case, striking down a denial of drawback based on Customs' imposition of requirements not found in regulation); *National Association of Manufacturers v. Secretary of the Treasury*, 10 F.4th 1279 (Fed. Cir. 2021) (in a 28 U.S.C. § 1581(i) case, striking down drawback regulations which could have been challenged under 28 U.S.C. § 1581(a).

31

**IV.    The CEE Was Required to Modify the CSMS and FAQs on Steel Section 232 Duties Pursuant to 19 U.S.C. § 1625(c).**

If this Court still believes that the CSMS and the FAQs did not require a formal legislative rule, Customs still did not follow the required procedures.  For purposes of the entries at issue, the CSMS and Customs FAQ page (cited above in the Statement of Facts) provide the only possible guidance to the public regarding the application of the Customs laws, including the Tariff Act of 1930 and the Trade Expansion Act of 1962.  The CSMS and Customs FAQ page constitute rulings, for purposes of Section 625 of the Tariff Act of 1930, as amended 19 U.S.C. § 1625, and were in existence for more than 60 days after the CEE Memo was made unofficially public.

Section 177.1(d)(1) of the Customs Regulations, 19 C.F.R. § 177.1(d)(1), provides that "A 'ruling' is a written statement issued by the Headquarters Office or the appropriate office of Customs as provided in this part that interprets and applies the provisions of the Customs and related laws to a specific set of facts."

Since the CSMS and FAQ were issued by Headquarters regarding the valuation of steel content on steel and derivative articles, any modification of such rules should have been done pursuant to statutory law.  In order for Customs or the CEE to modify the CSMS and FAQ, Customs would have had to provide the requisite notice and comment under 19 U.S.C. § 1625(c).  Specifically, that section states:

> A proposed interpretive ruling or decision which would—
>
> (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
> (2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;
>
> shall be published in the Customs Bulletin. The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision. After consideration of any comments received, the Secretary shall publish

32

> a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period. The final ruling or decision shall become effective 60 days after the date of its publication.

Given that Customs at the CEE did not follow Section 1625(c) to change the valuation of articles based on their steel content as detailed in the CSMS and FAQ, the CEE Memo, and its contents (as made effective through CF29s) are null and void.

**V.      The Valuation Statute at 19 U.S.C. § 1401a(f) Precludes the Choice of Valuation at a Higher of Two Amounts.**

To the extent Customs imposes a duty on the full value of a steel "derivative product[,]" rather than just the value of its steel content, this constitutes the appraisement of the entire imported articles.  Section 402 of the Tariff Act of 1930, as amended 19 U.S.C. § 1401a sets out various bases for the appraisement of imported merchandise.  Section 402(f)(2) of the Tariff Act of 1930, 19 U.S.C. § 1401a(f)(2), specifies bases of appraisement of merchandise which are prohibited.  In particular, Section 402(f)(2) provides in relevant part:

> (2) Imported merchandise may not be appraised, for the purposes of this chapter, on the basis of —

*     *     *

> (B)  A system that provides for the appraisement of imported merchandise at the higher of two alternative values;

*     *     *

> (G)  Arbitrary or fictitious values

To the extent the CEE Memorandum provides for the assessment of a duty on the basis of the higher of two alternative values (value of steel content versus value of complete article), it is a method of appraisement prohibited by 19 U.S.C. § 1401a(f)(2)(B).  This Court has confirmed that even where a retailer to middleman portion of a two-tiered sale in a first sale scenario caused a

33

sale for export—that section 1401a(f)(2)(B) prohibits looking at the higher valued sale for purposes of transaction value.

> This court also notes that if the "most direct cause of exportation" test compels use of the middleman-retailer price whenever the retailer's order causes the middleman to complete a sale with the exporter, Customs likely will have enacted a system requiring use of the alternative higher price in conflict with **19 U.S.C. § 1401a(f)(2)(B)**.

*Synergy Sport Int'l v. United States*, 17 C.I.T. 18, 20 (1993).

It is arbitrary and capricious for the Customs Base Metals CEE in its CEE Memorandum to assess duty on an imported article based on identification of a single component material of the article as prohibited by 19 U.S.C. § 1401a(f)(2)(G). To the extent that the CEE Memorandum employs methods of appraisement prohibited by 19 U.S.C. § 1401a(f)(2), and to the extent Customs has employed these methods to appraise plaintiff's merchandise in liquidation, this constitutes arbitrary and capricious agency action which must be set aside pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2).

## VI. The Paperwork Reduction Act Provides a Complete Defense to CBP's Retention of Express Fasteners' Payment of Section 232 Tariffs.

The CEE Memo and the CSMS are each "collection of information" requirements issued without compliance with the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq. ("PRA" or "the Act") and the Office of Management and Budget ("OMB") regulations implementing the PRA. Neither the CEE Memo nor the CSMS display a valid OMB control number. Nor does either one inform a recipient that no response to the CEE Memo or the CSMS is required absent the display of a valid OMB control number. For each of these two independent reasons, the PRA provides a complete defense to the retention of duties "penalty" imposed by CBP on Express Fasteners.

The applicable PRA provision, 44 U.S.C. § 3512, provides:

34

(a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—

    (1) the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter;

    (2) or the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

The CEE Memo requires the selected recipients of the CEE Memo to report the entered value of the finished steel product and steel derivative product as the cost of the content of the steel used to manufacture those articles and deposit section 232 tariffs on that entered value. As noted above, the CSMS provides reporting instructions, namely instructions to report the non-steel content and the steel content for all steel and steel derivative articles.

The PRA, at 44 U.S.C. § 3502(3), defines the term "collection of information" as follows:

(3) the term "collection of information"—

    (A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—

        (i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or

        (ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes; and

    (B) shall not include a collection of information described under section 3518(c)(1);

*See also*, OMB Regulations at 5 C.F.R. § 1320.3(c).The CEE Memo does not involve a collection of information excepted pursuant to section 3518(c)(1).

OMB Regulations, 5 C.F.R. § 1320.3(c)(1), broadly define the term "collection of information," as follows:

35

A "collection of information" may be in any form or format, including the use of report forms; application forms; schedules; questionnaires; surveys; reporting or recordkeeping requirements; contracts; agreements; policy statements; plans; rules or regulations; planning requirements; circulars; directives; instructions; bulletins; requests for proposal or other procurement requirements; interview guides; oral communications; posting, notification, labeling, or similar disclosure requirements; telegraphic or telephonic requests; automated, electronic, mechanical, or other technological collection techniques; standard questionnaires used to monitor compliance with agency requirements; or any other techniques or technological methods used to monitor compliance with agency requirements. A "collection of information" may implicitly or explicitly include related collection of information requirements.

The CEE Memo and the CSMS each constitute a "collection of information" requirement within the meaning of the Act and OMB Regulations in that each is a written agency solicitation and requirement of disclosure of facts or opinions in the form of an "instruction" calling for answers to identical questions posed to and reporting and recordkeeping requirements imposed on ten or more persons other than United States agencies, instrumentalities or employees. Express Fasteners and other selected importers who received the CEE Memo were required to report the "steel" and "non-steel" values of their derivative steel products under the pertinent tariff provision and deposit the amount of duties owed at the pertinent 50% section 232 rate in accordance with the CEE Memo and to pay any deficiency in the duties owed as so calculated that was assessed by CBP in liquidation.

CBP's retention of section 232 tariffs as a result of an improper information collection requirement is a penalty within the meaning of the PRA for which the Act provides a complete defense. The PRA defines a "penalty" to mean:

(14)  the term "penalty" includes the imposition by an agency or court of a fine or other punishment; a judgment for monetary damages or equitable relief; or the revocation, suspension, reduction, or denial of a license, privilege, right, grant, or benefit;

*Accord* 5 C.F.R. § 1320.3(j).

36

CBP's retention of Express Fasteners' funds through liquidation is a denial of the benefit of the use of those funds unlawfully collected.

In addition, in determining whether the CEE Memo and CSMS violate the PRA, the Court should consider that Express Fasteners' future failure to comply with the CEE Memo and the CSMS would expose the company to punishment in the form of CBP sanctions in the form of "live entry" and severe penalties. *See How Can I Obtain Information About Importer Sanctions?*, U.S. CUSTOMS AND BORDER PROTECTION https://www.help.cbp.gov/s/article/Article-1038?language=en_US, last visited June 22, 2026. The threat of penalty liability is real and immediate.

Notably, Presidential Proclamation 10947, paragraph (6), calls for severe consequences for "importers who submit underreported declarations" "including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law" and the recently issued Executive Order Strengthening Customs Enforcement, Executive Order ("EO") No. 14411, dated June 3, 2026, 91 Fed. Reg.35125, dated June 10, 2026, calls for the Secretary of the Department of Homeland Security to bolster enforcement of the customs laws, regulations and other mandates and, within 90 days (*i.e.,* by July 18, 2026) to revise all mitigation standards to include a minimum penalty floor of not less than 50 percent of the assessed penalty and eliminate mitigation for repeat offenders. *See* EO 14411 at paragraph 4(a) and 4(c)

To require importers to submit information on steel costs without seeking preclearance from the OMB under the PRA is a clear violation. *In Center for Auto Safety v. NHTSA*, 93 F. Supp. 2d 1 (District Court D.C. 2000), the defendant agency failed to obtain clearance for Information Requests on ten or more manufacturers in the auto industry. Answers to such requests were held voluntary because the defendant violated the PRA.

The fact that the PRA protections are not available to Intervenor-Defendants does not, however, answer the question of whether it was mandatory for the manufacturers to provide the [**50] information. The crux of the issue is whether NHTSA could have forced the manufacturers to respond to the IR had they chosen not to do so. The answer is unequivocally "no," because NHTSA **violated** the PRA by failing to obtain pre-clearance from OMB prior to sending out the IR. 44 U.S.C. § 3502(3)(A)(i); **5 C.F.R. §§ 1320.3** and 1320.5.

*In Ctr. for Auto Safety v. NHTSA*., 93 F. Supp. 2d at 17 (DC 2000).  According to the D.C. District Court,

The purpose of the PRA is to eliminate unnecessarily burden-some information requests. To provide efficient enforcement of the PRA, Congress decided that any request for information that is subject to the statute but does not comply with it may be ignored without penalty. 44 U.S.C. § 3512(a). Congress further provided that the protections of the PRA "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b).

*See id*. at 9.

Although the PRA functions as a defense to an enforcement action brought by an agency, and not as an independent mechanism for a person to affirmatively challenge the validity of a collection of information, a panel of the U.S. of Appeals for the 9th Circuit, in *Hyatt v. OMB*, 908 F.3d 1165, 1173 (9th Cir. 2018), has held that a claim under the APA, as brought here, may be brought in advance of enforcement proceedings so that, a party does not assume the risk of penalties if his belief is unwarranted:

That sort of alternative remedy is insufficient to defeat an APA claim, as "parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" citing *U.S. Army Corps of Eng'rs v. Hawkes Co*., 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs*., 387 U.S. at 153).at 14. *Hyatt v. Office of Management and Budget*, No. 17-17101 at 14 (9th Cir. 2018) citing *U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 591 (2016) (quoting *Abbott Labs*, 387 U.S. 136, 153) ("Parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'").

Accordingly, it is appropriate for this Court to determine whether the information requests in the CEE Memo and the CSMS violate the PRA, whether CBP's retention of section 232 duties paid by Express Fasteners constitute a refundable penalty because CBP's duty retention denies Express Fasteners a benefit, and no responses to the CEE Memo and CSMS are required in the future.

## **CONCLUSION**

For all the above reasons, the CEE Memorandum and any Customs action which assesses the 50 percent 232 duty on the value of an entire steel article should be struck down as a violation of the APA and the PRA.  In the alternative, if the Court finds the CSMS and FAQs as rules not requiring Notice and Comment, then Plaintiff asks the Court to find that the assessment of duty was only on the steel content as stated in the Proclamations of February 10 and June 3, the underlying entries should be assessed 50 percent ad valorem, only on the steel content of the imported goods as asserted at entry.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff*


/s/ John M. Peterson
John M. Peterson
Maria E. Celis
Richard O'Neill
Patrick B. Klein
Sanzida Talukder
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Michael K. Tomenga
Neville Peterson, LLP
1310 L Street, N.W., Suite 300
Washington, DC 20005-4870
(202) 776-1148
mtomenga@npwdc.com

Dated: June 30, 2026

40

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**
------------------------------------------------------------------ X
**EXPRESS FASTENERS, LTD.,**                                       :
                                                                   :
      **Plaintiff,**                  :
                                                                   :
      *v.*                            :    **Court No. 26-00853**
                                                                   :
**UNITED STATES,**                                                 :
                                                                   :
      **Defendant.**                  :
------------------------------------------------------------------ X

## CERTIFICATE OF COMPLIANCE

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 13,250 words.

Respectfully submitted,

/s/ Patrick B. Klein
Patrick B. Klein