**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**

---------------------------------------------------------------------- X

**EXPRESS FASTENERS, LTD.,** :

**Plaintiff,** :

***v.*** : **Court No. 26-00853**

**UNITED STATES,** :

**Defendant.** :

---------------------------------------------------------------------- X

**<u>PLAINTIFF'S RESPONSE TO DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE PLEADINGS AND PARTIAL MOTION TO DISMISS</u>**


NEVILLE PETERSON LLP
*Counsel for Plaintiff*

John M. Peterson
Maria E. Celis
Richard O'Neill
Patrick B. Klein
Sanzida Talukder
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Michael K. Tomenga
Neville Peterson, LLP
1310 L Street, N.W., Suite 300
Washington, DC 20005-4870
(202) 776-1148
mtomenga@npwdc.com


Dated: October 19, 2026

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE PLEADINGS AND PARTIAL MOTION TO DISMISS ........................................................................................1

ARGUMENT ........................................................................................................................7

I. Defendant Misunderstands the Nature of Plaintiff's Case. ..............................................7

II. Defendant Has Not Responded to Plaintiff's Claim that In Order to Collect a Tax, the Calculation of the Tax Must Be Defined through Notice and Comment Rulemaking in Accordance With 5 U.S.C. § 553. ..........................................................................11

III. Plaintiff timely protested and has a Viable Cause of Action under the APA. ...................17

IV. Both Parties Agree that the FAQ and the CSMS are Not Enforceable Rules....................21

V. The Valuation Statute at 19 U.S.C. § 1401a(f) Precludes the Choice of Valuation at The Higher of Two Amounts. ..........................................................................24

VI. The CEE Was Required to Modify the CSMS and FAQs on Steel Section 232 Duties Pursuant to 19 U.S.C. § 1625(c). ........................................................................25

VII. The Paperwork Reduction Act Provides a Defense to CBP's Assessment of "Penalties." ...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Am. Frozen Food Inst. v. United States*,18 C.I.T. 565 (Ct. Int'l Tr. 1994) .................................. 19
*Assn. of Data Processing Service Orgs. v. Bd., of Governors of the Fed. Reserve System*, 745 F.2d 677 (D.C. Cir. 1984). ........................................................................................ 17
*AutoAlliance Int'l, Inc. v. United States, 29 C.I.T. 1082* (Ct. Int'l Tr. 2005) ............................... 19
*B.F. Goodrich Co. v. United States*, 747 F. Supp. 1148 (Ct. Int'l Trade 1992) .......................... 20
*Burlington Truck Lines Inc. v. United States,* 371 U.S. 156 (1962) ................................................ 8
*Center for Auto Safety v. NHTSA*, 93 F. Supp. 2d 1 (District Court D.C. 2000) .................... 27, 28
*Central Soya Co. v. United States*, 15 C.I.T. 105 (Ct. Int'l Tr. 1991) ......................................... 20
*Children's Hosp. of the King's Daughters, Inc. v. Azar,* 896 F.3d 615 (4th Cir. 2018) .......... 22, 23
*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ............................................................................ 20
*Cmty. Nutr. Inst. v. Young*, 818 F.2d 943 (D.C. Cir. 1987) ........................................................ 15
*Dickinson v. Zurko*, 527 U.S. 150 (1999) ..................................................................................... 16
*Hyatt v. OMB*, 908 F.3d 1165 (9th Cir. 2018) ............................................................................... 28
*In re Lee*, 277 F.3d 1338 (Fed. Cir. 2002) ........................................................................................ 8
*Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) .. 15, 20, 21
*Iowa League of Cities v. EPA,* 711 F.3d 844 (8th Cir. 2013) ........................................................ 23
*Knowlton v. Moore*, 178 U.S. 41 (1900) ........................................................................................ 11
*Lane v. U.S. Dept. of Agric*., 130 F.3d 106 (8th Cir. 1997) ............................................................ 16
*Learning Resources Inc. v. Trump*, 607 U.S. 229 (2026) ................................................................. 4
*Mann Construction Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022) ........................ 15, 16, 17
*Marcello v. Bonds*, 349 U.S. 302 (1995) ......................................................................................... 16
*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ....................................................................... 23
*N. H. Hosp. Assn. v. Azar,* 887 F.3d 62 (1st Cir. 2018) ................................................................. 23
*Nat'l Ass'n of Mfrs. v. Sec'y of the Treasury* 10 F.4th 1279 (Fed. Cir. 2021) ............................... 20
*Nereida Trading Co. v. United States*, 34 C.I.T. 241 (Ct. Int'l Tr. 2010) ..................................... 18
*Perez v. Mortg. Bankers Ass'n.*, 575 U.S. 92 (2015) ....................................................................... 14
*Shalala v. Guernsey Mem'l Hosp*., 514 U.S. 87 (1995) ................................................................... 14
*Synergy Sport Int'l v. United States*, 17 C.I.T. 18 (Ct. Int'l Tr. 1993) .......................................... 25
*Tenn. Hosp. Ass'n. v. Azar*, 908 F.3d 1029 (6th Cir. 2018) .................................................... 14, 15
*Volkswagen of Am., Inc. v. United States*, 532 F. 3d 1365 (Fed. Cir. 2008) .......................... 17, 18

**Statutes**

19 U.S.C. § 1202 ............................................................................................................................ 24
19 U.S.C. § 1401a .................................................................................................................... passim
19 U.S.C. § 1484 ............................................................................................................................ 17
19 U.S.C. § 1500 .............................................................................................................................. 4
19 U.S.C. § 1514 ...................................................................................................................... 17, 18
19 U.S.C. § 1592 ............................................................................................................................ 17
19 U.S.C. § 1625 ............................................................................................................................ 25
19 U.S.C. § 1862 .......................................................................................................................... 2, 8
28 U.S.C. § 1581(a) ........................................................................................................... 17, 18, 19
28 U.S.C. § 2638 ............................................................................................................................ 19
28 U.S.C. § 2639(a)(1) ..................................................................................................................... 6

44 U.S.C. § 3501 .................................................. 25
44 U.S.C. § 3512 .................................................. 26
5 U.S.C. § 551 .................................................. 7, 14
5 U.S.C. § 553 .................................................. 8, 13, 16
5 U.S.C. § 559 .................................................. 17
5 U.S.C. § 706(2)(A) .................................................. 7, 8, 13, 25

**Other Authorities**

90 Fed. Reg. 24199 (published June 8, 2025) .................................................. passim
90 Fed. Reg. 9817 (published February 18, 2025) .................................................. 2
91 Fed. Reg.35125, dated June 10, 2026 .................................................. 27
*Const. L.-U.S. Tariffs & Customs-Procs. for Levying Ad Valorem Rates of Customs Duties-Cost-Ins.-Freight (Cif) Customs Valuation Sys.*, 2 U.S. Op. Off. Legal Counsel 249 (1978) .................................................. 11
CSMS Message 64256374 of June 3, 2025 .................................................. 21
*How Can I Obtain Information About Importer Sanctions?*, U.S. CUSTOMS AND BORDER PROTECTION, Nov. 4, 2025, https://www.help.cbp.gov/s/article/Article-1038?language=en_US .................................................. 27
*New York Customs Ruling N350227 of July 15, 2025* .................................................. 13
*New York Customs Ruling N351539 of August 19, 2025* .................................................. 12
U.S. Const. art. I, § 8, cl. 1 .................................................. 10

**Regulations**

19 C.F.R. § 158.12 .................................................. 18

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**

---------------------------------------------------------------- X

**EXPRESS FASTENERS, LTD.,** :

**Plaintiff,** :

***v.*** : **Court No. 26-00853**

**UNITED STATES,** :

**Defendant.** :

---------------------------------------------------------------- X

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR JUDGMENT ON THE PLEADINGS AND PARTIAL MOTION TO DISMISS**

In accordance with Rule 12(b) and (c) of the Rules of the U.S. Court of International Trade ("USCIT R."), Plaintiff, Express Fasteners, Ltd. ("Express"), respectfully submits its response to *Defendant's Cross Motion for Judgment on the Pleadings and Motion to Dismiss*, where Defendant summarily argues that "the Court should grant judgment in favor of the United States because there are no genuinely disputed issues of material fact and the United States is entitled to judgment as a matter of law." *Defendant's Cross Motion for Judgment on the Pleadings and Partial Motion to Dismiss*, ECF 24 ("Def.'s Cross Mot.") at 1.

While the Complaint alleges that Defendant through its agency, U.S. Customs and Border Protection ("CBP" or "Customs"), unlawfully assessed Section 232 duties on Plaintiff's imported merchandise by contradicting the very Presidential Proclamation that provided for them, the Defendant argues that Customs simply abided by the law and decided that Plaintiff's screws and fasteners should be subject to a duty of 50% on their entire value, rather than on the value of their "steel content" as prescribed under Presidential Proclamation 10947 of June 3, 2025, *Adjusting Imports of Aluminum and Steel Into the United States,* 90 Fed. Reg. 24199 (published June 8, 2025)

("the June 3rd Presidential Proclamation" or "Presidential Proclamation 10947"). Proclamation 10947 amended Presidential Proclamation 10896, *Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 9817 (published February 18, 2025) ("the February 10th Presidential Proclamation" or "Proclamation 10896").

Defendants misapprehend the nature of Plaintiff's case. This case does not pose a question concerning the "correct" way to calculate the contested tariffs (which Defendant purports to divine), as opposed to the "incorrect" way to assess them. What plaintiff asserts is that there is **no way** to calculate these duties, as Customs never provided a definition of the "value" of the metals on which the 50% *ad valorem* duty was to be reported and imposed. The lack of a definition renders the Section 232 tariff void in its entirety.

Defendant, in its Cross Motion, has not provided any response to Plaintiff's question:

> **How are taxpayers, threatened with penalties for failure to comply, to apply a tax where no rules were provided to actually calculate the tax?**

Defendant seemingly argues that Customs did its job and applied the law, but never explains how it defined "steel content" or "non-steel content" under Presidential Proclamation 10947. *See* Def.'s Cross Mot. at 10-15. But defendant was obligated to "fill in the gaps" in Presidential Proclamation 10947 and provide a definition. It failed to do this.[1]

Proclamation 10896 directed Customs to prioritize reviews of imports of steel and steel derivative articles and to impose penalties on any efforts to avoid the payment of such duties:

[1] Acting pursuant to taxing authority delegated by Congress pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, the President, on February 10, 2025, issued Presidential Proclamation 10896, *Adjusting Imports of Steel Into the United States*, 90 Fed. Reg. 9817 (published February 18, 2025), determining that imports of steel mill products and steel "derivative products" posed a threat to the "national security." Seeking to "adjust" such imports into the United States, Paragraph 3 of that Proclamation imposed an additional 25 percent *ad valorem* duty, in addition to any other duty, on a wide range of steel "derivative products" including the machine screws and fasteners which Plaintiff imports from Taiwan.

> (12) CBP shall prioritize reviews of the classification of imported steel articles and derivative steel articles and, in the event that it discovers misclassification resulting in non-payment of the ad valorem duties proclaimed herein, it shall assess monetary penalties in the maximum amount permitted by law and shall not consider any evidence of mitigating factors in its determination. In addition, CBP shall promptly notify the Secretary regarding evidence of any efforts to evade payment of the ad valorem duties proclaimed herein through processing or alteration of steel articles or derivative steel articles prior to importation. In such circumstances, the Secretary shall consider the processed or altered steel articles or derivative steel articles for inclusion as derivative steel articles pursuant to clause 5 of this proclamation.

To implement the tax and these directions, paragraph 14 of the Proclamation authorized the Secretary of the Treasury to issue any regulations necessary to implement of the Proclamation's provisions:

> (14) The Secretary may issue regulations and guidance consistent with this proclamation, including to address operational necessity.

The Secretary did not issue any such regulations.

Proclamation 10947, which amended Proclamation 10896, only further muddled the application of the 232 tariffs as it increased the duty rate from 25% to 50% and then asked Customs to apply the rate to "steel content" and "aluminum content" of "derivative" articles in Chapters 73 and 76. With respect to "derivative" steel articles, such as Plaintiff's machine screws and fasteners, Paragraph 6 of Proclamation 10947 states:

> (6) Notwithstanding any prior proclamation or Executive Order, the non-aluminum, non-steel content of all aluminum and steel articles and derivative articles shall be subject to tariffs pursuant to Executive Order 14257 of April 2, 2025 (Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits), as amended, and any other applicable tariffs. The additional ad valorem duties described in clause 1 and clause 7 of this proclamation shall apply only to **the steel content of articles in Chapter 73 of the HTSUS** and only to the aluminum content of articles in Chapter 76 of the HTSUS. U.S. Customs and Border Protection (CBP) shall issue authoritative guidance mandating strict compliance with declaration requirements for steel and aluminum content in imported articles and outlining maximum penalties for noncompliance, including that importers who submit underreported declarations may be subject to severe consequences, including but

> not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law.

(Emphasis added). This paragraph imposes the 50% Section 232 tariff on, *inter alia*, "the steel content of articles in Chapter 73 of the HTSUS."

Paragraph 10 of Proclamation 10947 provides:

> (10) The Secretary may issue regulations and guidance consistent with this proclamation, including to address operational necessity.

Again, the Secretary never issued any "regulations" consistent with the proclamation. While the June 3rd Proclamation requires assessment of a 50% duty on "the steel content of articles in Chapter 73 of the HTS," and one can intuit from the fact that the tax is *ad valorem* that this 50% impost must be on the *value* of the steel content, Customs never issued a rule specifying how the value of said steel content was to be calculated and declared to Customs in import documents for the purposes of collecting the 50% levy. It is clear that the 50% tariff is not to be assessed on the entire value of the article, since non-steel portions of the articles were to be separately classified and assessed with the "reciprocal tariffs" which the President had imposed under claimed authority of the International Emergency Economic Powers Act ("IEEPA").[2]

Section 500 of the Tariff Act [19 U.S.C. § 1500] requires the responsible Customs officer to determine value of a good, determine its classification and rate of duty, and determine the duty to be assessed. This duty cannot be carried out absent a definition of the dutiable "value".

The only guidance provided by Customs on the value issue was a Frequently Asked Question ("FAQ") entry on one of the agency's website pages, suggesting only that importers

[2] These tariffs were recently held unlawful and unconstitutional by the United States Supreme Court in *Learning Resources Inc. v. Trump*, 607 U.S. 229 (2026).

should bear in mind the valuation "principles" set out in Section 402 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1401a.[3]

Absent any clear and binding guidance from the Secretary of the Treasury or Customs concerning how to value the "steel content" of "derivative articles," Plaintiff and other similarly-situated importers were left to fend for themselves. Where an importer had access to factory cost data and knew what the factory had paid for the steel used to make an article, the importer could use that data. But many importers did not have, and could not get access to, such data. Some tried to estimate the value of steel content by calculating such content from bills of materials and valuing it according to publicly-available price indices or quotations. Numerous other methods were tried.

Moreover, neither the Secretary nor Customs issued any guidance concerning how importers should account for costs of fabrication, processing, labor or other costs incurred in producing the merchandise, or for the allocation of any profits or markups earned by the seller.[4]

---

[3] Ironically, Section 402 is intended only to value merchandise for the purpose of the imposition of tariffs imposed under Chapter 4 of title 19 of the United States Code. Thus, 19 U.S.C. § 1401a begins by stating:

> **(a)Generally**
>
> Except as otherwise specifically provided for in this chapter, imported merchandise shall be appraised, **for the purposes of this chapter**, on the basis of the following:
> …

Duties imposed under Section 232 of the Trade Expansion Act of 1962 are not imposed under Chapter 4 of Title 19, but under Chapter 7 of that Title.

[4] References to the valuation principles set out in Section 402 of the Tariff Act of 1930, 19 U.S.C. § 1401a, are relatively unavailing. The first three bases of valuation in the statute—transaction value of the imported merchandise, 19 U.S.C. § 1401a(b), transaction value of identical or similar merchandise, 19 U.S.C. § 1401a(c) and deductive value, 19 U.S.C. § 1401a(d)—all seek to determine a value for the entire imported article, not a part of an article or of a particular constituent material. "Computed value," in 19 U.S.C. § 1401a(e), does call for the separate calculation of the costs of material and fabrication, plus an addition for general overhead and profit. But "computed

The lack of a definition of "value" ultimately perplexed CBP's own officers. Ultimately, CBP threw up its hands and assessed a duty on Plaintiff's machine screws and fasteners in liquidation by assessing the 50% ad valorem tariff on the entire entered value of the machine screws and fasteners—providing the same treatment to these steel "derivative articles" as Presidential Proclamation 10947 did to steel "mill products"—even though, by the Proclamation's terms, the President intended the two classes of articles to be treated differently. It appears that this decision to impose the 50% duty on the full value of a steel derivative article is consistent with the treatment issued by Customs' Center of Excellence and Expertise ("CEE") for Base Metals set out in an unpublished Memorandum ("CEE Memo") dated December 3, 2025, and updated March 15, 2026 [see Exhibit A].

Customs' determination that the Section 232 duties should be assessed on the full value of Plaintiff's goods—a decision entitled to a statutory presumption of correctness, *see* 28 U.S.C. § 2639(a)(1)—implies that Plaintiff, in making entry of the goods at bar at a lower value, has indeed placed itself in peril "that importers who submit underreported declarations may be subject to severe consequences, including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law", as set out in paragraph 6 of Presidential Proclamation 10947.

Plaintiff submits that the imposition of additional duties on its merchandise in liquidation—indeed the imposition of *any* Section 232 tariffs on Plaintiff's merchandise—is unlawful. Presidential Proclamation 10947, an exercise of delegated Congressional taxing power, established a "substantive rule" of general applicability, imposing obligations on affected members of the

---

value" can only be used by producers of goods, and the "cost of materials" is based on the producer's own books and records—data which, as noted above, is unavailable to most importers.

public. The Proclamation left "gaps" to be filled by agency rulemaking—specifically a gap concerning how the values of "steel content" and "non-steel content" for covered articles were to be determined and reported. It required the promulgation of a "legislative-type rule" pursuant to the notice-and-comment provisions contained in the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., to guide the public. Section 10 of Proclamation 10947 gave the Secretary the power to issue such rules, but the Secretary failed to do so.

Because the Proclamation imposed a rule of general applicability that imposed obligations on the public, to be carried out under pain of penalty, but no legislative-type regulation was issued to guide the public on how that obligation was to be carried out, the tariff is void in its entirety.

Because Customs failed to follow the requirements of the APA in this case, the Court must hold unlawful and set aside the assessment of Section 232 tariffs on the entries at bar pursuant to the APA, which requires a reviewing court to hold unlawful and set aside "action, findings and conclusions found to be arbitrary, capricious an abuse of discretion, or not otherwise in accordance with law," 5 U.S.C. § 706(2)(A) and done "without observance of procedure required by law", 5 U.S.C. § 706(2)(D).

## ARGUMENT

### I. Defendant Misunderstands the Nature of Plaintiff's Case.

Defendant misunderstands the gravamen of Plaintiff's case. This is not a question of whether Customs used the "right way" or the "wrong way" to determine the value of the steel content of Express Fasteners' machine screws for tariff assessment. Nor does plaintiff offer a "right way" to calculate the tariffs.

Rather, plaintiff asserts that Presidential Proclamation 10947 provided **no way** to determine the value of steel "content" which is to be subject of a 50% *ad valorem* tariff under

Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. Faced with this "gap" in the Proclamation, it fell to Customs to adopt a "legislative rule" defining the value of dutiable "steel content", using the "notice and comment" rulemaking procedures of the Administrative Procedure Act (APA), 5 U.S.C. § 553. Yet Customs neither proposed nor adopted such a "legislative rule." It follows that there is **no** operative definition of "value" of a covered article's "steel content" and any assessment of the duty by Customs is thus "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and must be set aside as required by 5 U.S.C. § 706(2)(a)[5].

Defendant's Cross-Motion and response offers a formulation which suffers from at least three fatal flaws.

First, defendant asserts, without citation to authority, that because Plaintiff's machine screws are classifiable in Chapter 73 of the Harmonized Tariff Schedule, they are subject to a 50% tariff on their full "transaction value." This is purely a *post-hoc* rationalization of counsel[6], and a gross misreading of Presidential Proclamation 10947. That Proclamation clearly distinguished between "core" steel products, primarily classified in HTS Chapter 72, which were to be assessed with a 50% duty on their full value, and steel "derivative" products, classified under clearly specified tariff headings in HTS Chapter 73 (including those for machine screws) which were to be assessed with a 50% Section 232 duty only on their "steel content" and with an IEEPA "reciprocal tariff" on their "non-steel content". The Proclamation does not indicate whether non-steel content includes the value of processing performed to steel, or is limited to *materials* other

[5] To the extent the promulgation of a legislative rule was also required to provide a legal foundation for assessing the tariff, the assessments are also done "without observance of procedure required by law and may be set aside under 5 U.S.C. § 706(2)(D).

[6] The law in this circuit is clear: a court may not consider the post-hoc rationalization of counsel. *In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002) (citing *Burlington Truck Lines Inc. v. United States,* 371 U.S. 156, 168 (1962)).

than steel. But defendant's *post-hoc* formulation writes out of the Proclamation altogether the notion that derivative products such as Plaintiff's have a "non-steel content" at all. Had the Proclamation meant to impose a 50% tariff on the full value of machine screws, without acknowledging a non-steel value, it would have done so. It did not, and Customs' CSMS message indicated that, for "derivative articles" separate tariff provisions were to be used to report the "steel" and "non-steel values, to which different rates of duty were to be applied.

Second, defendant errs in supposing (Def. Br. at p. 10-11) that Express Fasteners is arguing that the correct way to calculate the value of the steel content is to begin with the "transaction value' of the machine screw and deduct "costs of fabrication, processing, labor or other costs incurred in producing the merchandise [including] allocation of any profits or markups earned by the seller". **Plaintiff makes no such argument**. While that might have been a plausible formulation for valuing steel content, **it was never set out in the Proclamation nor in any implementing regulation.** We do not ask this Court to adopt that formulation as a basis for calculating the 50% duty owed. To be clear, Express Fasteners is asserting that the government **never adopted, by Proclamation or regulation, *any* definition of the value of a "derivative" article's steel content**, meaning that **no determinable, valid tax or duty has been, or can be, calculated or imposed.** It is not for this Court to adopt a definition of "value" that Customs failed to adopt. As noted above, the dispute in this case is not between the "right way" or the "wrong say" to value the steel content in assessing Section 232 tariffs. Plaintiff is contending that there is **no way**.

Third, Defendant errs by constructing its analysis—its *post-hoc* rationalization of counsel—around the notion of "transaction value" and other concepts taken from Section 402 of the Tariff Act of 1930, *as amended*, 19 U.S.C. § 1401a. By its terms, Section 402 applies to

appraising goods "for purposes of this chapter [4, of Title 19, United States Code]." Section 232 tariffs of a kind at issue here are imposed under Chapter 7 of Title 19. As noted in our initial brief, the valuation concepts in 19 U.S.C. § 1401a do not lend themselves easily to determining the value of a material in a good, rather than the value of the good itself.[7]

The government's brief spends substantial effort [Def. Br. at 10-15] explaining how Customs' appraisement of the "steel content" of Plaintiff's goods was consistent with the "transaction value" of imported goods set out at 19 U.S.C. § 1401a. But "transaction value" reflects the value of the entire article, not the value of an input material. And as the notion of "steel content" relates purely to the assessment of a Section 232 tariff under Part 7 of Title 19, United States Code, defendant fails to show how 19 U.S.C. § 1401a, which values goods for purposes of tariffs imposed only under Part 4 of Title 19, applies at all.[8]

Article I, § 8, cl. 1 of the Constitution of the United States grants Congress the power to lay and collect taxes, duties, imposts, and excises, but adds that "all Duties, Imposts and Excises shall be uniform throughout the United States" This "Uniformity Clause" of the Constitution was designed to ensure that there was no geographic discrimination in tariff rates. *Knowlton v. Moore*,

[7] Plaintiff has noted that the only analog in Section 402 is in the definition of "computed value" pursuant to 19 U.S.C. § 1401a(e), which requires the separate determination of the value of materials, fabrication, general overheads and profits. Under this definition, the cost of "materials" is isolated and distinct from the costs of the operations performed on them to produce the finished article. Defendant counters by noting that "computed value" includes the value of processing and overheads [Def. Br. at 13], but this again misses the point. Proclamation 10947, as it applies to steel "derivative" products, does not seek to assess the 50% Section 232 tariff on the entire value of the article, but only on the [undefined] value of its "steel content". Nothing suggests that Customs appraised plaintiff's machine screws on the basis of "computed value" and the government's observation that computed value contains overheads, etc. [Def. Br. at 13] is of no moment.

[8] If counsel's *post-hoc rationalization* that Customs correctly determined that the entire value of the machine screws was equal to the entire value of the goods, it would follow that plaintiff's goods had no "non-steel value", and the entry would have been liquidated with a refund of the IEEPA duties paid on the "non-steel value." That did not occur, however.

178 U.S. 41, 106 (1900). But "duties" cannot be uniform across the United States when there is no uniform rule for determining the value of tariffed articles, and different Customs officers are free to follow different valuation approaches. Taxation is not equivalent to passing a collection plate in church, where each congregant makes an offering based on his or her own perception of what is the proper amount to offer. While the Uniformity Clause is designed to prevent geographic discrimination (and has never been the basis for striking down a statute), some officials have considered the notion that valuation methods might be problematic under the Uniformity Clause. A 1978 Office of Legal Counsel opinion specifically addressed the issue by comparing the *Knowlton* case with the effects of a CIF customs valuation scheme. The concern in which the opinion was asked to address was whether the CIF method was geographically discriminatory where "two physically identical items from the *same* source could be valued unequally in two *different* points of entry in the United States." *Const. L.-U.S. Tariffs & Customs-Procs. for Levying Ad Valorem Rates of Customs Duties-Cost-Ins.-Freight (Cif) Customs Valuation Sys.*, 2 U.S. Op. Off. Legal Counsel 249, 251 (1978). The opinion drew a distinction between the CIF method and an FOB system in which the latter "would not tend to generate inequalities among different States, or among different ports of the same State, with regard to the value assigned to physically identical articles imported from the same source." *Id.*

## II. Defendant Has Not Responded to Plaintiff's Claim that In Order to Collect a Tax, the Calculation of the Tax Must Be Defined through Notice and Comment Rulemaking in Accordance With 5 U.S.C. § 553.

Defendant argues that because Plaintiff's merchandise is 100% steel, then the 232 rate of 50% should be applied to the goods entirely. Def.'s Cross Mot. at 11. Moreover, according to Defendant, Customs properly applied transaction value and because the Proclamation did not state anything about items of Chapter 73 being broken out into constituent costs. Def.'s Cross Mot. at

11-12. However, Proclamation 10947 is clear: "The additional ad valorem duties described in clause 1 and clause 7 of this proclamation shall apply **only** to the steel content of articles in Chapter 73 of the HTSUS and only to the aluminum content of articles in Chapter 76 of the HTSUS." Proclamation 10947 at ¶ 6 (emphasis added). Nothing in that statement speaks of applying the 50% rate to the entire value of steel or aluminum goods in Chapter 73 or 76. More alarming is that Customs issued no rules to calculate the steel content in articles of Chapter 73, but waited until November or December 2025 to issue a plainly invalid CEE Memo to rate advance Plaintiff's goods.

If the Proclamation was not clear in breaking up derivative articles to their "steel": and "non-steel" contents, then why did Customs' Office of Rulings and Regulations ask importers in their rulings to value Chapter 73 or 76 articles according to their steel and aluminum content for purposes of 232 duties? Rulings issued by the Acting Director, National Commodity Specialist Division, Regulations and Rulings, and published on CBP's website in its Customs Rulings Online Search System ("CROSS") hold that section 232 duties apply only to the metal content of steel, aluminum or copper derivative articles subject to section 232 duties, and that 232 duties do not apply to the full value of the imported derivative articles declared by the importer. Customs specifically determined that the 232 duties apply to the steel content of articles of Chapter 73. *See New York Customs Ruling N351539 of August 19, 2025* (Hardware packs for rail systems classified in Chapter 73.) "On March 12, 2025, Presidential Proclamation 10896 imposed additional tariffs on certain derivative iron or steel products. Additional duties for derivative iron or steel products of 50 percent are reflected in Chapter 99, headings 9903.81.89, 9903.81.90, and 9903.81.91. Products provided by heading 9903.81.91, as well as products of Chapter 73 provided by 9903.81.89 and 9903.81.90, will be subject to a duty of 50 percent upon the value of the steel

content." *See also New York Customs Ruling N350227 of July 15, 2025* (bolt and hex nut units classified in Chapter 73 — "Products provided by heading 9903.81.91, as well as products of Chapter 73 provided by 9903.81.89 and 9903.81.90, will be subject to a duty of 50 percent upon the value of the steel content.") Thus, Customs' "CEE Memo" is inconsistent with the agency's own rulings.

Defendant does not deny that the ideas set forth in the "CEE Memo" were the basis for the final liquidation of Plaintiff's entries as it reiterates these ideas in its Cross Motion. *See* Def.'s Cross Mot. at 1. Moreover, Defendant argues the CEE Memo does not impose any new rules as it applies "the provisions of Presidential Proclamation No. 10947, without expanding the provisions established by the Proclamation." Def.'s Cross Mot. at 20. However, at no point does defendant cite any legal authority for the CEE memo, issued by Customs' Base Metals Center of Excellence and Expertise (which is not authorized to issue rulings) and which is not published anywhere.

However, by telling Plaintiff that its steel derivative goods should be broken down according to steel and non-steel costs or values, Proclamation 10947 has (1) imposed new rules of general applicability for valuation of imported merchandise, specifically steel articles for purposes of the 232 duties; and (2) left a gap to be filled by legislative regulations in accordance with the notice and comment rulemaking procedures set out in the APA at 5 U.S.C. § 553. Specifically, the government has not published the contents of the CEE Memo as a proposed regulation, nor solicited public comment concerning it. To the extent that the CEE Memo was required to be promulgated as a regulation pursuant to the APA, and was not so promulgated, it is null and void and of no effect, and this Court must set it aside pursuant to 5 U.S.C. § 706(2)(B), along with actions taken pursuant to the CEE Memo, such as the appraisement of Plaintiff's imported goods in liquidation.

Under the APA, 5 U.S.C. § 551, a legislative rule—also called a substantive rule—is a regulation issued by an agency that creates new legal rights, duties, or obligations for the public. These rules carry the full force and effect of law, similar to statutes passed by Congress, and must be adopted in accordance with the APA's procedural requirements to be valid and enforceable. A legislative rule binds the public and the agency, carries legal weight, and establishes concrete standards.

The APA, at 5 U.S.C. § 551(4), defines a "rule" as follows:

> (4)"rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

Rulemaking, moreover, "means agency process for formulating, amending, or repealing a rule", 5 U.S.C. § 551(5). There are specific procedures to create substantive rules, and the Defendant has not followed them.

The CEE Memo is in nature a purported legislative rule, despite the Defendant's arguments that it is mere guidance. Legislative rules have the "force and effect of law[;]" interpretive rules do not. *Perez v. Mortg. Bankers Ass'n.*, 575 U.S. 92, 96-97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp*., 514 U.S. 87, 99 (1995)). Legislative rules impose new rights or duties and change the legal status of regulated parties; interpretive rules articulate what an agency thinks a statute means or remind parties of pre-existing duties. *Tenn. Hosp. Ass'n. v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018). When rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules; interpretive rules merely clarify the requirements

that Congress has already put in place. *Id.* at 1043. *See Mann Constr. v. United States*, 27 F.4th 1138, 1143-45 (6th Cir. 2022).

There can be no doubt that Presidential Proclamation 10947, a delegated exercise of Congressional taxing power, is a substantive rule requiring notice-and-comment rulemaking procedures. First, it imposes a tax. It proclaims a rule of general applicability; it affects all importers of steel "derivative products." It imposes an obligation on affected importers to report certain values and pay substantial duties on those values. The Proclamation exposes regulated parties to civil and criminal penalties for "underreporting" certain values, without specifying how those values should be determined and reported. It is well established that determination requiring taxpayers to report a transaction on pain of penalty retains the essential qualities of a legislative rule subject to notice and comment procedures. *See Cmty. Nutr. Inst. v. Young*, 818 F.2d 943, 946-47 (D.C. Cir. 1987) (per curiam) (characterizing an agency pronouncement as a legislative rule, rather than a policy statement, because language used in the document gave it present binding effect). That a determination requires creation of a new HTSUS number for reporting is another strong indication that a legislative-type rulemaking is required. *See Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d 1255, 1283-1286 (Ct. Int'l Trade 2019).

Similarly, Presidential Proclamation 10947 required the promulgation of new HTSUS provisions, suggesting that implementation of the change necessitated a "substantive rulemaking" to effect it.

As we argued in our initial brief, *Mann Construction Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022) is instructive of substantive rulemaking. *See* Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mot. J. Pleadings"), ECF 21, at 20-22. In that case, the Internal Revenue Service ("IRS") issued Notice 2007-83, an informal document comparable to the CEE Memo, which

described certain potential tax-avoidance transactions involving insurance policies which had to be reported to the IRS. When the Plaintiffs did not report certain transactions specified in the notice, they were subjected to penalties. They argued that the Notice was a "substantive rule" required to be issued by the IRS using "notice and comment" rulemaking proceedings set out in 5 U.S.C. § 553. The 6th Circuit agreed with Plaintiffs. The instant case is similar to *Mann Construction* in virtually all respects. Proclamation 10947, an exercise of delegated legislative taxing authority, established a new rule of general applicability which imposed new obligations on regulated members of the public—namely, an obligation to file Customs entries declaring the value of the "steel content" of imported "derivative products" and to pay a 50% duty thereon. The Proclamation empowered the Secretary of the Treasury to make any regulations necessary to effectuate its commands. The Proclamation left a gap for the agency to fill by regulation—specifically, defining how the value of the "steel content" should be calculated. However, the agency failed to issue this necessary definitional regulation. CBP's assessment of the 50% tariff against Plaintiff's goods without first issuing a rule explaining the required calculation was therefore unlawful.

Congress did not exempt CBP from the APA's requirement to conduct "notice and comment" rulemaking in this case. "The baseline assumption for agency action that will have the force and effect of law is that it must go through notice and comment. 5 U.S.C. § 553; *Mann Construction,* 27 F.4th 1138, 1144. There is a presumption that APA rulemaking requirements apply to agency action. *Lane v. U.S. Dept. of Agric*., 130 F.3d 106, 109-110 (8th Cir. 1997). "Exemptions from the terms of the APA are not lightly to be presumed" *Marcello v. Bonds*, 349 U.S. 302, 310 (1995); *Dickinson v. Zurko*, 527 U.S. 150, 155 (1999). Nothing in Section 232 of the Trade Expansion Act or Proclamation 10947 suggests an intent to waive the rulemaking

requirements of the APA here; indeed Section 10 of the Proclamation expressly contemplates rulemaking to make its pronouncements effective[9]. Whether faced with statutes potentially on one side of the line or the other (i.e., substantive v. interpretive), courts remain vigilant that "the import of the [5 U.S.C. § 559] instruction is that Congress intent to make a substantive change be clear." *Assn. of Data Processing Service Orgs. v. Bd., of Governors of the Fed. Reserve System*, 745 F.2d 677, 686 (D.C. Cir. 1984).

Where, as here, Congress has tasked CBP with requiring importers to "make a return or statement" by filing Customs entries containing certain information, *see* 19 U.S.C. § 1484, and to do so under pain of penalty, *see* 19 U.S.C. § 1592(a), the intent that notice-and-comment rulemaking be done to indicate the information to be reported is especially clear. *Mann Constr.,* 27 F.4th 1138, 1144.

## III. Plaintiff timely protested and has a Viable Cause of Action under the APA.

Defendant's assertion that Plaintiff cannot, in a protest denial action, plead a claim grounded in the Administrative Procedure Act (APA) is unfounded. Defendant agrees that Plaintiff timely protested, but incorrectly claims that an APA challenge may not be bought in a § 1581(a) case. There is no basis for the notion, expressed in Defendant's Answer and Cross Motion in this case, that APA claims cannot be raised in a case founded on this this Court's 28 U.S.C. § 1581(a) "protest denial" decision. In its Answer, ¶¶ 38, 40, 48, and 54, and Def.'s Cross Mot. at 15-17, Defendant argues that Plaintiff is precluded from raising an APA claim under 19 U.S.C. § 1514, citing *Volkswagen of Am., Inc. v. United States*, 532 F. 3d 1365, 1367 (Fed. Cir. 2008).

[9] Even the Proclamation 10947 did not contain this provision, Customs had an independent obligation to consider whether notice and comment legislative rulemaking was appropriate to "fill the gap" which the Proclamation left open.

However, the Government again mischaracterizes the *Volkswagen* case, which supports Plaintiff's position. That case involved facts where the Plaintiff did not file a timely protest claim and thus was precluded from bringing an APA styled action pursuant to 19 C.F.R. § 158.12 under this Court's residual jurisdiction, 28 U.S.C. § 1581(i). On the contrary, *Volkswagen* and subsequent cases actually hold that a properly filed 19 U.S.C. § 1514 protest case is required for an APA claim. Citing *Volkswagen,* this Court has held in *Nereida Trading Co. v. United States*, 34 C.I.T. 241, 251 (Ct. Int'l Tr. 2010) that,

> 19 C.F.R. § 158.12 does not create a separate cause of action for [the allowance sought by the Plaintiff], and that the only cause of action for such an allowance must be made pursuant to the procedures set forth in 19 U.S.C. § 1514.")

*Nereida Trading Co. v. United States*, 34 C.I.T. 241, 250-251 (2010), citing *Volkswagen of Am., Inc. v. United States*, 532 F. 3d 1365, 1367 (Fed. Cir. 2008).

The Court also stated,

> The Federal Circuit explained that recognition of that "independent cause of action" would "frustrate" 19 U.S.C. § 1514's "'single, continuous procedure for deciding all issues in any entry of merchandise.'" *Volkswagen*, 532 F.3d at 1373 (quoting S. Rep. No. 91-576 at 11 (1969)).

*Nereida Trading Co. v. United States*, 34 C.I.T. 241, 251.

Here, Plaintiff has a properly filed 19 U.S.C. § 1514 protest claim, namely against the liquidation of entries challenging the amounts of duties chargeable, and asserting that Customs, in assessing these duties, followed its own made-up rules (which Plaintiff refers to as the CEE Memo as denied by Defendant) in violation of the APA and notice and comment rule-making. There is no frustration of §1514 if the decision to apply APA violative rules resulted in the increase of rate and duties at liquidation.

Moreover, "manifest inadequacy" applies to claims improperly brought under 28 U.S.C. § 1581(i), not to claims correctly brought under 28 U.S.C. § 1581(a). As Defendant states, Plaintiff timely filed its protest claim and can bring any claims that culminate in the assessment of duties and the liquidation of its entries. Here the APA is not an independent cause of action but is cited in a protest denial action as a basis for invalidating a duty assessment. This Court has acknowledged that, "[i]n hearing a § 1581(a) case, the Court may also consider the procedures Customs followed in administering its protest decision*." AutoAlliance Int'l, Inc. v. United States, 29 C.I.T. 1082, 1083* (Ct. Int'l Tr. 2005). This Court further specified that APA claims are viable under 28 U.S.C. § 2638, which "permits this [c]ourt to consider any new grounds, such as the APA claim, during the course of [§ 1581(a)] litigation." *Autoalliance Int'l, Inc. v. United States.,* 29 C.I.T. 1082, 1093-94 (2005). The Government is incorrect and Plaintiff is not precluded from raising APA issues in a 19 U.S.C. § 1514 protest case before this Court.

In *Am. Frozen Food Inst. v. United States*,18 C.I.T. 565 (Ct. Int'l Tr. 1994), this Court invalidated a Customs pronouncement styled as Treasury Decision 94-5, requiring special country of origin marking for imported frozen vegetables in packages. The Court ruled that the requirement, failure to comply with could expose the importer to special marking duties and penalties, was a "legislative rule" that required notice and comment APA rulemaking before it could be adopted:

> The court concludes that because Customs has chosen to promulgate front panel marking in combination with other requirements clearly needing APA rulemaking procedures, the entirety of T.D. 94-5 may not stand. It would be neither reasonable for the court to bifurcate T.D. 94-5 when Customs did not do so originally, nor equitable to proceed on two separate tracks for those parties who must comply and manufacture new labelling.

18 C.I.T at 575.

The claims raised i*n Am. Frozen Food Inst.*, *supra*, could have been raised by protesting an assessment of marking duties and challenging the denial of the protest, but this Court elected to hear the case under its 28 U.S.C. § 1581(h) pre-enforcement ruling review jurisdiction, to avoid "irreparable injury" plaintiff would suffer if forced to pursue the protest remedy. But the *Am. Frozen Food Inst.*, Court noted the decision in *B.F. Goodrich Co. v. United States*, 747 F. Supp. 1148, 1154 (Ct. Int'l Trade 1992), a 28 U.S.C. § 1581(a) case where the Court invoked the APA to enjoin enforcement of a Customs drawback regulation containing conditions not found in the drawback statute.[10]

This is not a close case. Presidential Proclamation 10947, an exercise of delegated Congressional taxing power, imposed new substantive requirements of general applicability that imposed significant obligations on members of the public, to be performed under pain of civil and criminal penalties. It left "gaps" concerning important aspects of its command—specifically, how the "steel value" and "non-steel value" of steel "derivative products" should be calculated and declared to CBP, and how affected parties' duty-paying obligations should be calculated. It required the creation of new HTSUS items. "Filling the gap required the promulgation of a 'legislative rule' having the force and effect of law," *see Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979), and specifically authorized CBP to engage in rulemaking.

The requirement of "notice and comment" rulemaking extends to Customs law matters. *See Invenergy Renewables Inc. v. United States*, 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019). There, the United States Trade Representative ("USTR") had previously excluded bifacial solar

[10] *See also Central Soya Co. v. United States*, 15 C.I.T. 105 (Ct. Int'l Tr. 1991) (in a 28 U.S.C. § 1581(a) case, striking down a denial of drawback based on Customs' imposition of requirements not found in regulation); *Nat'l Ass'n of Mfrs. v. Sec'y of the Treasury* 10 F.4th 1279 (Fed. Cir. 2021) (in a 28 U.S.C. § 1581(i) case, striking down drawback regulations which could have been challenged by litigating a denied protest claim under 28 U.S.C. § 1581(a)).

panels from the scope of goods subject to a Section 201 safeguard measure directed at solar panels. The initial determination of goods subject to the measures had been done using notice-and-comment proceedings. USTR sought to summarily withdraw bifacial solar panels from the list of goods excepted from the safeguards. This Court held that USTR's withdrawal constituted agency rulemaking and was required to be done in accordance with APA specified "notice and comment" procedures.

"Additionally," the *Invenergy* Court held, "that the Exclusion and Withdrawal required an accompanying modification to the HTSUS is indicative of the determination that these actions are rulemakings." *Id.* at 1285.

In the instant case, Proclamation 10947 also created new HTSUS headings, and required importers to report values thereunder. It left a "gap" for the agency to fill, specifically, to define the values of "steel content" and "non-steel content" required to be reported to CBP – under pain of penalty. Paragraph 10 of the Proclamation expressly empowered CBP to make any regulations necessary to effectuate the Proclamation's commands. CBP declined to act, leaving Plaintiff Express Fasteners and thousands of similarly situated importers to fend for themselves in attempting compliance.

## IV. Both Parties Agree that the FAQ and the CSMS are Not Enforceable Rules.

The Defendant argues that the FAQ and Cargo Systems Messaging Service ("CSMS") message do not require rulemaking because they are simply guidance documents and do not create obligations. Def.'s Cross Mot. at 18-19. Plaintiff submits that such documents do not even provide any guidance on how to calculate and value the steel content as required by the Proclamations.

CSMS Message 64256374 of June 3, 2025, directs importers to make entry of the value of "steel content" and "non-steel content" on separate entry line items, using different HTSUS codes,

but provides no guidance concerning how the value of the steel content should be calculated. The FAQ cited by the Government only applies to goods outside Chapters 73 and 76 and not to the goods at issue, *see* Def.'s Cross Mot. pg. 19, does not specify a rule, but suggests that the value of the steel content be calculated "using the *principles of* the Customs Valuation Agreement, as implemented in 19 U.S.C. § 1401a[,]" paraphrasing that statute's definition of the transaction value of imported merchandise, *id.*, § 1401a(b), before suggesting that "[n]ormally, this would be based on the invoice paid by the buyer of the steel/aluminum content to, or for the benefit of the seller of the steel/aluminum content" which, as noted above, would be information not available to many if not most importers.

Plaintiff concurs that no enforceable rule is created by the FAQ or CSMS especially in the area of monetary regulation or the imposition of duties, as in this case. In *Children's Hosp. of the King's Daughters, Inc. v. Azar,* 896 F.3d 615 (4th Cir. 2018), a dispute arose concerning the maximum amount of financial assistance a hospital which served a disproportionate share of low-income or special needs patients (known as "disproportionate share hospitals" or "DSHs") could receive. The Secretary of Health and Human Services ("HHS") issued an FAQ on the agency's website, without following notice-and-comment rulemaking, taking a e position regarding which payments should be included in calculation of the hospital's DSH limit, but taking no position on private insurance payments.

Both the District Court and the Court Appeals held that the assessment against the hospital was not lawful, since the calculation formula was a "legislative rule" that was required to be promulgated via notice-and-comment rulemaking under the APA.

Noting that "[a] rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects a substantive change in existing law or

policy", citing *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014), the *Children's Hosp.* appellate Court said that a rule is also legislative if it "expand[s] the footprint of a regulation by imposing new requirements, rather than simply interpreting the legal norms Congress or the agency itself has previously created", 896 F.3d at 620, quoting *Iowa League of Cities v. EPA,* 711 F.3d 844, 873 (8th Cir. 2013).

HHS conceded that the regulatory formula at issue in *Children's Hospital* did not specifically identify payments by Medicare or private insurers, leaving a "gap" for the agency to fill by rule. Rejecting HHS's argument that the FAQ policy had its genesis in a previously issued regulation, the Court expressly stated, "We disagree. The calculation methodology in the rule itself does not mention—let alone specifically address—payments by private insurers." 896 F.3d at 621. Similarly, here, CBP has issued no rule providing or suggesting a rule for calculating the value of "steel content" to which a 50% ad valorem tariff will be applied. Customs agrees that its FAQ issued with respect to the Section 232 duties at issue in this case falls far short of the legislative rule and is simply guidance. However, by failing to promulgate a rule pursuant to the APA, Customs has failed to fill the gap which the President, exercising delegated legislative power, left to fill—namely, defining the value of the "steel content" of such products which was to be subject to a 50% ad valorem tariff. "When Congress leaves such a policy choice to the agency, "we should lean toward finding that the agency's making of that choice requires notice and comment." *N. H. Hosp. Assn. v. Azar,* 887 F.3d 62, 70 (1st Cir. 2018).

**V. The Valuation Statute at 19 U.S.C. § 1401a(f) Precludes the Choice of Valuation at The Higher of Two Amounts.**

By imposing a duty on the full value of a steel "derivative product[,]" rather than just the value of its steel content, Customs has violated 19 U.S.C. § 1401a(f)[11]. Section 402 of the Tariff Act of 1930, as amended 19 U.S.C. § 1401a, sets out various bases for the appraisement of imported merchandise. Section 402(f)(2) of the Tariff Act of 1930, 19 U.S.C. § 1401a(f)(2), specifies bases of appraisement of merchandise which are prohibited. In particular, Section 402(f)(2) provides in relevant part:

> (2) Imported merchandise may not be appraised, for the purposes of this chapter, on the basis of —
>
> ***
>
> (B) A system that provides for the appraisement of imported merchandise at the higher of two alternative values;
>
> ***
>
> (G) Arbitrary or fictitious values

To the extent the CEE Memo proposes to apply Section 402 of the Tariff Act of 1930, as amended [19 U.S.C. § 1401a], it provides for the assessment of a duty on the basis of the higher of two alternative values (value of steel content versus value of complete article), and is therefore a method of appraisement prohibited by 19 U.S.C. § 1401a(f)((2)(B). This Court has confirmed that even where a retailer to middleman portion of a two-tiered sale in a first sale scenario caused a sale for export—that section 1401a(f)(2)(B) prohibits looking at the higher valued sale for

[11] This presumes that Section 1401a can be used to calculate Section 232 tariffs. Certainly, it can be used to calculate Column 1 or 2 tariffs imposed under the Harmonized Tariff Schedule, *see* 19 U.S.C. § 1202.

purposes of transaction value. *See Synergy Sport Int'l v. United States*, 17 C.I.T. 18, 20 (Ct. Int'l Tr. 1993).

It is arbitrary and capricious for the Customs Base Metals CEE in its CEE Memo to assess duty on an imported article based on identification of a single component material of the article as prohibited by 19 U.S.C. § 1401a(f)(2)(G). To the extent that the CEE Memo employs methods of appraisement prohibited by 19 U.S.C. § 1401a(f)(2), and to the extent Customs has employed these methods to appraise Plaintiff's merchandise in liquidation, this constitutes arbitrary and capricious agency action which must be set aside pursuant to the APA, 5 U.S.C. § 706(2). Customs provided no argument against this reasoning in its Cross Motion.

## VI. The CEE Was Required to Modify the CSMS and FAQs on Steel Section 232 Duties Pursuant to 19 U.S.C. § 1625(c).

Assuming that the CSMS and FAQ were "interpretive rulings" asking for the 50% duty to be applied to the steel content of the derivative articles, and that they were modified by the CEE Memo, they could not be modified without following the "notice and comment" rulings procedures set out in Section 625 of the Tariff Act of 1930, as amended 19 U.S.C. § 1625. These published pronouncements were, and were in existence for more than 60 days after the CEE Memo was made unofficially public. As such § 1625(c) calls for the modification of such rules only after specific "notice and comment" procedures are completed.

## VII. The Paperwork Reduction Act Provides a Defense to CBP's Assessment of "Penalties."

Finally, the government argues that the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.* ("PRA" or "the Act") and the Office of Management and Budget ("OMB") regulations implementing the PRA may not be used as a defense to the collection of information for 232 Tariff purposes.

Plaintiff did not argue that the PRA is being used as a defense to the imposition of duties or collection of information to provide for the duties, only that Express' payment of 232 tariffs with no express rule may be likened to a penalty. Additionally, if penalties are asserted as a result of some allegation of improper reporting for 232 duties, the PRA should be raised as a defense to such penalties. *See* Pl's Mot. J. Pleadings at 34-35.[12] The CEE Memo and the CSMS are each "collection of information" requirements issued without compliance with the PRA. Neither the CEE Memo nor the CSMS displays a valid OMB control number. Nor does either one inform a recipient that no response to the CEE Memo or the CSMS is required absent the display of a valid OMB control number.

The CEE Memo requires the selected recipients of the CEE Memo to report the entered value of the finished steel product and steel derivative product as the cost of the content of the steel used to manufacture those articles and deposit section 232 tariffs on that entered value. As noted above, the CSMS provides reporting instructions, namely instructions to report the non-steel

---

[12] For each of these two independent reasons, the PRA provides a complete defense to the retention of a duty "penalty" imposed by CBP on Express Fasteners.

The applicable PRA provision, 44 U.S.C. § 3512, provides:

> (a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—
>
> > (1) the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter;
> >
> > (2) or the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.
>
> (b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

content and the steel content for all steel and steel derivative articles. In addition, as Plaintiff argued in its initial brief, in determining whether the CEE Memo and CSMS violate the PRA, the Court should consider that Express Fasteners' future failure to comply with the CEE Memo and the CSMS would expose the company to punishment in the form of CBP sanctions in the form of "live entry" and severe penalties. *See How Can I Obtain Information About Importer Sanctions?*, U.S. CUSTOMS AND BORDER PROTECTION, Nov. 4, 2025, https://www.help.cbp.gov/s/article/Article-1038?language=en_US, for information on importer sanctions for delinquent payment of duties. The threat of penalty liability is real and immediate.

Notably, Presidential Proclamation 10947 ¶ 6, calls for severe consequences for "importers who submit underreported declarations" "including but not limited to significant monetary penalties, loss of import privileges, and criminal liability, consistent with United States law" and the recently issued EO Strengthening Customs Enforcement, EO No. 14411, dated June 3, 2026, 91 Fed. Reg.35125, dated June 10, 2026, calls for the Secretary of the Department of Homeland Security to bolster enforcement of the customs laws, regulations and other mandates and, within 90 days, i.e., by July 18th, to revise all mitigation standards to include a minimum penalty floor of not less than 50 percent of the assessed penalty and eliminate mitigation for repeat offenders. *See* EO 14411 at ¶¶ 4(a) and 4(c)

To require importers to submit information on steel costs without seeking preclearance from the OMB, or providing clear rules as to how duties are collected under the PRA is a clear violation. In *Center for Auto Safety v. NHTSA*, 93 F. Supp. 2d 1 (District Court D.C. 2000), Defendant agency failed to obtain clearance for Information Requests on ten or more manufacturers in the auto industry. Answers to such requests were held voluntary because Defendant violated the PRA.

> The fact that the PRA protections are not available to Intervenor-Defendants does not, however, answer the question of whether it was mandatory for the manufacturers to provide the information. The crux of the issue is whether NHTSA could have forced the manufacturers to respond to the IR had they chosen not to do so. The answer is unequivocally "no," because NHTSA **violated** the PRA by failing to obtain pre-clearance from OMB prior to sending out the IR. 44 U.S.C. § 3502(3)(A)(i); **5 C.F.R. §§ 1320.3** and 1320.5.

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin*., 93 F. Supp. 2d 1, 17 (DDC 2000).

According to the District Court of DC,

> The purpose of the PRA is to eliminate unnecessarily burden-some information requests. To provide efficient enforcement of the PRA, Congress decided that any request for information that is subject to the statute but does not comply with it may be ignored without penalty. 44 U.S.C. § 3512(a). Congress further provided that the protections of the PRA "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b).

*See id*. at 9.

Although the PRA functions as a defense to an enforcement action brought by an agency, and not as an independent mechanism for a person to affirmatively challenge the validity of a collection of information, a panel of the U.S. of Appeals for the Ninth Circuit, in *Hyatt v. OMB*, 908 F.3d 1165, 1173 (9th Cir. 2018), has held that a claim under the APA, as brought here, may be brought in advance of enforcement proceedings so that a party does not assume the risk of penalties if his belief is unwarranted:

> That sort of alternative remedy is insufficient to defeat an APA claim, as “parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of ‘serious criminal and civil penalties.’” citing *U.S. Army Corps of Eng’rs v. Hawkes Co*., 136 S. Ct. 1807, 1815 (2016) (quoting Abbott Labs., 387 U.S. at 153).at 14. *Hyatt v. Office of Management and Budget*, No. 17-17101 at 14 (9th Cir. 2018) citing *U.S. Army Corps of Eng’rs v. Hawkes Co*., 578 U.S. 590, 591 (2016) (quoting *Abbott Labs*, 387 U.S. 136, 153) (“Parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of ‘serious criminal and civil penalties.’”).

As Plaintiff is challenging final agency action, the APA claim is being brought in advance of any enforcement proceedings for penalties. Moreover, the collection of information under the CEE Memo does nothing to alleviate the obligation of Customs and the Secretary to issue the necessary rules under the APA to clarify how to calculate the 232 duties on screws and fasteners of Chapter 73. Should the government be allowed to collect any information it needs to assess a duty or tax without clear rules on how to calculate that tax? We think not.

## CONCLUSION

For all the above reasons, Defendant's Cross Motion and Partial Motion to Dismiss must be denied. The CEE Memo and any Customs action which assesses the 50 percent 232 duty on the value of an entire steel article should be struck down as a violation of the APA and the PRA. In the alternative, if the Court finds the CSMS and FAQs as rules not requiring Notice and Comment, then Plaintiff asks the Court to find that the assessment of duty was only on the steel content as stated in the February 10th and June 3rd Proclamations, and that the underlying entries should be assessed 50 percent *ad valorem* only on the steel content of the imported goods as asserted at entry.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff*

/s/ John M. Peterson
John M. Peterson
Maria E. Celis
Richard O'Neill
Patrick B. Klein
Sanzida Talukder
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Michael K. Tomenga
Neville Peterson, LLP
1310 L Street, N.W., Suite 300
Washington, DC 20005-4870
(202) 776-1148
mtomenga@npwdc.com

Dated: October 19, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE HON. JANE A. RESTANI, JUDGE**

| | | |
|---|---|---|
| **EXPRESS FASTENERS, LTD.,** | : | |
| **Plaintiff,** | : | |
| ***v.*** | : | **Court No. 26-00853** |
| **UNITED STATES,** | : | |
| **Defendant.** | : | |

## CERTIFICATE OF COMPLIANCE

Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 9,508 words.

Respectfully submitted,

/s/ Patrick B. Klein
Patrick B. Klein